UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

       Plaintiff            Case No. 98-80695

    v.                   Detroit, Michigan
                           Friday, July 24, 1998
FAWZI MUSTAPHA ASSI,      Magistrate Judge Morgan

       Defendant
_____/

DETENTION HEARING

BEFORE THE HONORABLE VIRGINIA MORGAN, MAGISTRATE JUDGE

TRANSCRIPT ORDERED BY:  LYNN HELLAND (Office of the
United States Attorney)

APPEARANCES:

For the Plaintiff:        United States Attorney Office
                        BY:  LYNN HELLAND
                        211 W. Fort Street, Suite 2001
                        Detroit, MI  48226


For the Defendant:        BY:  DAVID STEINGOLD
                        2100 Penobscot Building
                        Detroit, MI  48226


Transcribed by:           Lynn L. Spietz
                        13810 Courtland
                        Oak Park, MI  48237

<u>TABLE OF CONTENTS</u>

PROCEEDINGS - Friday, July 24, 1998                           3

COLLOQUY RE:   CHARGES AGAINST THE DEFENDANT                  4

WITNESSES - GOVERNMENT

**Michael Thomas**
    Direct Examination by Mr. Helland                         6
    Cross-Examination by Mr. Steingold                       44
    Redirect Examination by Mr. Helland                      73
    Recross-Examination by Mr. Steingold                     75

PRETRIAL SERVICES REPORT                                     77

PROFFER FOR THE DEFENDANT                                    80

CLOSING ARGUMENTS
    For the Government                                       81
    For the Defendant                                        85
    Rebuttal for the Government                              88

RULING OF THE COURT                                          89

<u>EXHIBITS</u>

| GOVERNMENT | | I.D. | Rec'd |
|---|---|---|---|
| GX 1 | Invoice for night vision goggles | 17 | |

DEFENDANT

None

1          Detroit, Michigan

2          Friday, July 24, 1998

3          Afternoon Session

4                  — — —

5          THE CLERK:  The Court now calls the case of Fawzi

6    Assi, 98-80695.

7          MR. HELLAND:  Lynn Helland on behalf of the United

8    States, your Honor.

9          MR. STEINGOLD:  David Steingold appearing on behalf

10   of Mr. Fawzi, who is present and standing to my left, your

11   Honor.

12         MR. HELLAND:  Your Honor, Mr. Assi was arrested

13   yesterday on a complaint that charges him with three separate

14   violations.  I'll discuss the violations in a moment.  He was

15   -- made his initial appearance before Judge Carlson.  We

16   requested a detention hearing at that time.  He is before the

17   Court this afternoon for the purpose of holding that detention

18   hearing, and we are prepared to proceed.

19         THE COURT:  Okay.

20         MR. STEINGOLD:  Your Honor, I wasn't aware of

21   whether he had been arraigned yesterday on the complaint.

22         MR. HELLAND:  Well, there is no arraignment on a

23   complaint.  He appeared before the magistrate for purpose of

24   --

25         MR. STEINGOLD:  I didn't even know he appeared

3

1    before the magistrate.

2              MR. HELLAND:  Okay.

3              THE COURT:  Yeah, he -- my notes from Judge Carlson

4    show that he did come in yesterday, the 23rd.  He was

5    temporarily detained.  He indicated that he would retain his

6    own lawyer, and he received a copy of the complaint.  He was

7    interviewed this afternoon by Pretrial Services, who is

8    present in court but has not made a written report.  And so

9    since both of you are ready to go with a detention hearing,

10   he's -- Mr. Sims is going to sit through this, and then he

11   might have further recommendation at the end of the hearing.

12             MR. STEINGOLD:  That's fine, your Honor.

13             THE COURT:  Is that okay?

14             MR. HELLAND:  Uh-huh.

15             THE COURT:  Okay.  All right.  Then you can have a

16   seat at the table.

17        (Discussion off the record.)

18             THE COURT:  Okay.

19             MR. HELLAND:  Your Honor, by way of preliminary

20   proceeding, I mentioned that there are three separate

21   violations that are charged in the complaint here.  Each of

22   them are somewhat unusual, so I'd like to briefly describe

23   them for the Court.

24             First, Mr. Assi is charged with violating 18 United

25   States Code Section 2339(b), which makes it a crime to provide

4

1  material support or resources to an international terrorist

2  organization.   In this case the international terrorist

3  organization that we allege was being supported is the

4  Hizballah organization.

5          He is also charged with violating the Export Control

6  Act, Title 22 United States Code Section 2778.   That statute

7  makes it a crime to export without a license items that are on

8  what is called the munitions control list.   In this case,

9  night vision goggles were on the munitions control list, and

10  Mr. Assi attempted to export them without a license.

11          The third statute that's involved is another export

12  control statute.   It's Title 50 United States Code Section

13  1705.   And that statute makes it a crime to export without a

14  license items that are on another list, another -- but not the

15  munitions control list.   In this case it's a list maintained

16  by the Secretary of Commerce, and one of the items on that

17  list is a -- what's called a thermal imaging camera.   And Mr.

18  Assi was attempting to export such a camera without a license.

19  And that's the basis for the third charge in this case.

20          Before I call the agent, are there any questions

21  about --

22          THE COURT:   None of those -- do any of -- does the

23  presumption of detention attach to any of those statutes?

24          MR. HELLAND:   No.

25          THE COURT:   Okay.

5

M. Thomas/Direct Examination (Helland)

1      MR. HELLAND:  Mr. Thomas.

2      AGENT THOMAS:  Yes, sir.

3      MR. HELLAND:  Would you please take the stand.

4      THE COURT:  And Mr. Steingold, there's nothing you

5  want to tell me preliminarily, is there?

6      MR. STEINGOLD:  No.  I'll waive my opening

7  statement, your Honor.

8      THE COURT:  Okay.

9      MICHAEL J. THOMAS, GOVERNMENT WITNESS, SWORN

10      THE COURT:  All right.  Have a seat.  State your

11  name, and spell -- spell your last name for the record.

12      THE WITNESS:  Special Agent Michael J. Thomas,

13  T-h-o-m-a-s.

14                    **DIRECT EXAMINATION**

15  BY MR. HELLAND:

16  Q.   And how are you employed, Agent Thomas?

17  A.   I'm employed as a special agent for the Federal Bureau of

18  Investigation.

19  Q.   And what particular part of the FBI?

20  A.   International and domestic terrorism.

21  Q.   Are you assigned to the Detroit office?

22  A.   Yes, I am.

23  Q.   And how long have you been employed by the FBI?

24  A.   A little over a year; approximately 14 months.

25  Q.   And how long have you been assigned to the Detroit

M. Thomas/Direct Examination (Helland)

1   office?

2   A.    Approximately 10 months.

3   Q.    And during the entire 10 months, have you been working on

4   the International Terrorism Squad?

5   A.    Yes, I have.

6   Q.    Okay.  As a part of your duties on the International

7   Terrorism Squad, did you become involved in an investigation

8   of Fawzi -- that's F-a-w-z-i -- Mustapha Assi, A-s-s-i?

9   A.    Yes, I did.

10   Q.    And as a part of becoming involved -- well, let me take a

11   step back.  Is it one of the duties of the International

12   Terrorism Squad to monitor the activities of persons who are

13   within the United States but acting on behalf of foreign

14   governments and foreign organizations?

15   A.    Yes, sir, it is.

16   Q.    And was it as a part of carrying out those duties that

17   you became involved in the matter of Mr. Assi?

18   A.    Yes, sir, it was.

19   Q.    Now, it wasn't just you working on this matter; is that

20   correct?

21   A.    No, sir, it was not.

22   Q.    And as part of the collective FBI involvement with Mr.

23   Assi, did there come a time when the FBI caused a wire tap to

24   be placed on one or more of Mr. -- of the phones that Mr. Assi

25   uses?

7

M. Thomas/Direct Examination (Helland)

1   A.   Yes, sir, there was.

2   Q.   And could you please tell the Court how many phones that

3   Mr. Assi uses were placed under wire tap?

4   A.   Three, sir.

5   Q.   And which phones were those?

6   A.   There's the phone at his residence, there's another phone

7   at his residence which he uses for electronic mail computers,

8   fax line, and, sir, there's his work line.

9   Q.   And through your work in this case did you -- were you

10   able to determine where it is that Mr. Assi works?

11   A.   Yes, sir, we were.

12   Q.   And where is that?

13   A.   Ford Motor Company.

14   Q.   In what capacity?

15   A.   He's an engineer, sir.

16   Q.   At what location?

17   A.   River Rouge plant, Dearborn, Michigan.

18   Q.   After you began monitoring Mr. Assi's telephone calls,

19   did it come to your attention that Mr. Assi was involved with

20   possible exports to Lebanon?

21   A.   Yes, sir, it did.

22   Q.   And could you please tell the Court how it is that

23   monitoring telephone calls brought that to your attention?

24   A.   Sir, it was electronic surveillance coverage on the phone

25   lines, and we intercepted calls between Mr. Assi and an

8

M. Thomas/Direct Examination (Helland)

1    individual by the name of Hassan in Lebanon where Hassan, last

2    name unknown at that point, had indicated to Mr. Assi if he

3    had obtained the equipment that Hassan had asked him to get,

4    and would he -- was he going to bring that equipment with him

5    to Lebanon on his most recent trip to Lebanon.

6    Q.    And at that time were you aware of what the equipment

7    was?

8    A.    Yes, sir.

9    Q.    What did you understand the equipment to be?

10   A.    Sir, we knew of the night fishing goggles, sir, and

11   possibly the other devices.  There's another agent working

12   this, and she may be aware of the specific other item, but we

13   were aware of the night vision goggles.

14   Q.    Based on what you're aware of, it was night vision

15   goggles and possibly something else, but you're not sure?

16   A.    Yes, sir.

17   Q.    Okay.  Did there come a time when you became aware that

18   Mr. Assi may in fact attempt to export night vision goggles

19   and possibly other equipment from the United States?

20   A.    Yes, sir, there was.

21   Q.    And about when was it that you became aware of that?

22   A.    Approximately the week prior to his departure.

23   Q.    And just so we can fix a time frame here, did there come

24   a time when Mr. Assi did attempt to depart?

25   A.    Yes, sir, there was.

9

M. Thomas/Direct Examination (Helland)

1    Q.   And when was that?

2    A.   I believe that was on 7-15th-97 (sic).

3    Q.   Could it have been July 13th?

4    A.   I'm sorry, July 13th, '97 (sic).

5    Q.   Okay.  So it was sometime during the week before that

6    that you became aware of his plans to depart?

7    A.   Correct.

8    Q.   Okay.  At the time that you became aware of his plans to

9    depart, did you make contact with any other agency?

10   A.   Yes, sir, we did.

11   Q.   And who did you make contact with?

12   A.   U.S. Customs and U.S. Commerce.

13   Q.   And did you make the determination or did you learn at

14   that time whether the export of night vision goggles was

15   controlled by United States law?

16   A.   I don't believe that determination was made at that time.

17   We weren't sure on the specific items, the exact

18   specifications of the items.

19   Q.   Okay.  Let me ask the question a different way then.  At

20   that time, did you have an expectation that it was likely that

21   the export of night vision equipment would be covered by

22   United States law?

23   A.   Yes, we did.

24        MR. STEINGOLD:  Your Honor, I'm not -- I would ask

25   that some foundation be laid before the conclusory statement

M. Thomas/Direct Examination (Helland)

1    by counsel leading the witness.

2        THE COURT:  Sustained.  You can ask him less leading

3    questions.

4        MR. HELLAND:  Okay.

5        THE COURT:  I know he's only been there ten months,

6    but he might as well figure this out for himself.

7    BY MR. HELLAND:

8    Q.   Agent Thomas, did you ultimately have contact with a

9    person at -- an agent at United States Customs?

10   A.   Yes, we did.

11   Q.   And who was that agent?

12   A.   Special Agent Michael Steinbach.

13   Q.   And did you make any request of Agent Steinbach?

14   A.   Yes, we did.

15   Q.   And what did you request?

16   A.   We requested that Mr. Assi be stopped on his way out of

17   the country.

18   Q.   Did you later have a conversation with Agent Steinbach,

19   following -- sometime on or after July 13th of this year, did

20   you have a conversation with Agent Steinbach?

21   A.   Yes, we did.

22   Q.   And what did --

23       MR. STEINGOLD:  Your Honor, I apologize, but if the

24   witness is going to continually use the term "we," I'd ask

25   that he identify who "we" are, and so we can distinguish what

M. Thomas/Direct Examination (Helland)

1  he may have done as opposed to what he has been told somebody

2  else did.

3           THE COURT:  I think that's fair.

4           MR. HELLAND:  I also note, your Honor -- and I'll

5  endeavor to do that -- Mr. Steingold will have a great

6  opportunity for cross-examination as well to clear up --

7           THE COURT:  I'm just having a little trouble

8  following exactly what was going on and under what authority

9  they stopped him, and I didn't think we stopped people going

10 out of the country, but -- okay.

11          MR. HELLAND:  That's a legal question which I'll

12 address right now, your Honor.  The United States has

13 authority to stop anybody entering or leaving the country for

14 any purpose.  There is no probable cause requirement, there is

15 no -- it's unlike a search within the United States.

16          THE COURT:  What this -- I guess I'm having trouble

17 -- was this at the airport?  Was this as he was going out?

18 How did this occur?  Was this at some time before he got

19 there?

20          MR. HELLAND:  That's where -- that's where I'm

21 trying to get to.

22          THE COURT:  Okay.

23          MR. HELLAND:  So let me -- let me answer those

24 momentarily.

25 BY MR. HELLAND:

12

M. Thomas/Direct Examination (Helland)

1   Q.   Did you have a conversation, Agent Thomas, with Special

2   Agent Steinbach on or after July 13th?

3   A.   Yes, I did.

4   Q.   And what, if anything, did Agent Steinbach inform you

5   regarding Mr. Assi and any efforts to locate Mr. Assi?

6   A.   Agent Steinbach informed me that Mr. Assi was stopped in

7   an outbound check, and in his possession, on his carry-on

8   possession, he had --

9   Q.   Excuse me, you said an outbound check.  At what location?

10  A.   At the airport location.

11  Q.   Which airport?

12  A.   The Detroit Metro Airport.

13  Q.   And when you say an outbound check, where was it that Mr.

14  Assi was -- was headed at that time?

15  A.   For Lebanon, sir.

16  Q.   Okay.  And what happened, according to Agent Steinbach,

17  at the airport?

18  A.   He was stopped on an outbound check, and in his

19  possession he had two global positioning modules.

20  Q.   Agent, I'm going to ask you to go real slowly here.  What

21  is a global positioning module?

22  A.   A global positioning module is an aviation piece of

23  equipment that triangulates satellite positions, and navigates

24  either an aircraft or some other type of equipment.

25  Q.   Okay.  He had two such modules.  What else did he have on

M. Thomas/Direct Examination (Helland)

1   him?

2   A.   Agent Steinbach then informed me that Mr. Assi's bags

3   were retrieved, and a subsequent search revealed that Mr. Assi

4   had in his possession seven night vision goggles and also an

5   infrared camera device.

6   Q.   Agent Thomas, can you please briefly explain just I think

7   for the record what the night vision goggles are used for?

8   A.   Night vision goggles are used for seeing in the dark.

9   Q.   Okay.  And, sir, before you began work for the FBI, where

10  did you work?

11  A.   U.S. Army.

12  Q.   And based on your experience in the Army, are you

13  familiar with what a thermal imaging camera is used for?

14  A.   Yes, sir, I am.

15  Q.   And could you please tell the Court what that's used for?

16  A.   A thermal imaging camera is used to pick up a person's

17  body heat, used to identify soldiers or, as we call it the

18  enemy, to identify them based on their heat.  If a soldier is

19  fully camouflaged, you would not be able to identify him at

20  night looking through a night vision device, but a body

21  constantly gives off a heat source, and this camera picks up

22  that heat source, identifies it as a -- as a heat image, and

23  then has the capability of recording that information.

24  Q.   Okay.  Agent Thomas, did Agent Steinbach tell you whether

25  or not he had spoken with Mr. Assi, as Mr. Assi was attempting

M. Thomas/Direct Examination (Helland)

1   to leave the country?

2   A.   Yes, he did.

3   Q.   And could you please briefly tell the Court what, if

4   anything, Mr. Assi told Agent Steinbach about his -- his plans

5   with respect to these items?

6   A.   Mr. Assi indicated to Agent Steinbach that he was

7   exporting these items for an individual by the name of Hassan,

8   at the request of Hassan, to be used -- when asked by Agent

9   Steinbach what this equipment would be used for, at first Mr.

10  Assi didn't indicate.  Later, in a subsequent interview, Agent

11  Steinbach again asked him what this equipment would be used

12  for, and Mr. Assi identified security purposes.

13          Agent Steinbach noted the -- along with the

14  equipment were some receipts for this equipment.  Agent

15  Steinbach noticed that the modules were extremely expensive,

16  the global positioning modules.  Agent Steinbach asked Mr.

17  Assi --

18  Q.   When you -- when you say extremely expensive, could you

19  give us some idea of that?

20  A.   Approximately $25,000 apiece.

21  Q.   Okay.

22  A.   Agent Steinbach then asked Mr. Assi, these are very

23  expensive pieces of equipment.  You know, what's the -- what

24  are they going to be used for?  What's they used for?  Mr.

25  Assi indicated that they would be used for unmanned aerial

15

M. Thomas/Direct Examination (Helland)

1   vehicles for surveillance for security purposes, possibly with
2   a camera mounted in them.
3   Q.    Did Mr. Assi indicate to Agent Steinbach how it was that
4   he was paying for this equipment?
5   A.    He indicated that his brother, Sami Assi, had returned
6   from a prior trip to Lebanon, and was given four $15,000
7   cashier checks by this individual Hassan to purchase these
8   items.  Mr. Assi then in turn deposited these $15,000 checks
9   into his account, and subsequently drew cashier checks off
10  that account to pay for these items.
11  Q.    Did Agent Steinbach make an effort to determine Hassan's
12  last name?
13  A.    Yes, he did, sir, and Mr. Assi stated at that time he did
14  not know his last name.
15  Q.    Did Agent Steinbach make an effort to determine whether
16  or not Mr. Assi was affiliated with any foreign organizations?
17  A.    Yes, he did.
18  Q.    And what did Mr. Assi indicate?
19  A.    He indicated no affiliations with any type of
20  organization.
21  Q.    Did Agent Steinbach make an effort to determine whether
22  or not Mr. Assi was aware of any import restriction on the
23  equipment that he was taking overseas?
24  A.    Agent Steinbach did inquire about the item -- Agent
25  Steinbach informed me that the items were clearly marked with

16

M. Thomas/Direct Examination (Helland)

1    it is illegal to export this item.  When asked, Mr. Assi

2    indicated he was packing in a hurry and did not see those

3    warning labels.

4    Q.    Following your conversation with Agent Steinbach

5    regarding the interview on July -- first, did this interview

6    take place on July 13th?

7    A.    The one with Agent Steinbach and Mr. Assi?

8    Q.    Yes.

9    A.    Yes, it did.

10   Q.    And that was at Detroit Metro Airport?

11   A.    Yes, it was.

12   Q.    Okay.  Following that interview, were you provided with a

13   document by Agent Steinbach pertaining to the night vision

14   equipment?

15   A.    Yes, sir, I was.

16              THE COURT:  Then I take it he didn't make his plane.

17              THE WITNESS:  No, ma'am, he did not.

18   BY MR. HELLAND:

19   Q.    I'm going to hand you what I've marked for purposes of

20   today's hearing as Government Exhibit 1.  Is that the document

21   that you were provided?

22   A.    Yes, sir, it is.

23   Q.    And what is that document?

24   A.    Sir, it's an invoice from Excaliber Enterprises for the

25   sale of five night vision goggles.

M. Thomas/Direct Examination (Helland)

1  Q.   And in particular, what is the first page of that

2  document?

3  A.   Sir, it's a statement of understanding that there are

4  export requirements for these night vision devices.

5  Q.   And is that a -- is that statement of understanding

6  signed?

7  A.   Yes, sir, it is.

8  Q.   And whose signature does it bear?

9  A.   Fred M. Assi.

10  Q.   Are you familiar through your investigation of Mr. Assi

11  whether or not he has used the name Fred?

12  A.   Yes, sir, I am.

13  Q.   And how are you familiar with that?

14  A.   His passport, his American passport, is issued to

15  Frederick Assi.

16  Q.   Agent Thomas, did anything -- was -- what happened to the

17  equipment that Agent Steinbach located at that time?

18  A.   The equipment was detained by the Customs pending

19  determination for licensing requirements.

20  Q.   Was Mr. Assi himself detained?

21  A.   No, sir, he was not.

22  Q.   And what, if anything, was done to monitor the activities

23  of Mr. Assi following his stop at the airport?

24  A.   Mr. Assi was placed on FBI surveillance.

25  Q.   And was that a temporary surveillance, an intermittent

M. Thomas/Direct Examination (Helland)

1  surveillance?  What sort of surveillance was it?

2  A.   It was a 24-hour surveillance.

3  Q.   Was Mr. Assi also requested that were he to make any

4  plans to leave the Detroit area, he notify Agent Steinbach?

5  A.   I believe he was.

6  Q.   Okay.  Did there in fact come a time when he did notify

7  Agent Steinbach that he intended to leave the Detroit area?

8  A.   Yes, sir.

9  Q.   And that was to go where?

10  A.   To Tennessee.

11  Q.   And to your knowledge, did he travel to Tennessee?

12  A.   Yes, sir, he did.

13  Q.   And to what part of Tennessee?

14  A.   Gatlinburg, Tennessee.

15  Q.   In the vicinity of the Smoky Mountains?

16  A.   Yes, sir.

17  Q.   Okay.  And during that time did the surveillance

18  continue?

19  A.   Yes, sir, it did.

20  Q.   And when was it, approximately, that he left for

21  Gatlinburg, Tennessee?

22  A.   I believe 7-15, sir.

23  Q.   Okay.  And that would be July 15th you mean?

24  A.   (No audible response.)

25  Q.   During that time was Mr. Assi made aware that he was

M. Thomas/Direct Examination (Helland)

1   under surveillance?

2   A.   When he got to Tennessee, he was aware he was under

3   surveillance.

4   Q.   Okay.  And how were you aware of that?

5   A.   Agents approached him and identified as being

6   surveillance.

7   Q.   Did there come a time when Mr. Assi was interviewed

8   again?

9   A.   Yes, there was.

10  Q.   And when was that?

11  A.   I believe it was July 20th.

12  Q.   Agent Thomas, I'm going to hand you, just for purposes of

13  refreshing your recollection, a 302.  Is that a 302 of the

14  second interview of Mr. Assi?

15  A.   Yes, it is.

16  Q.   And does that identify the date on which that second

17  interview took place?

18  A.   Yes, it does.

19  Q.   And what was that date?

20  A.   7-17-98, transcribed on 7-20-98.

21  Q.   Okay.  And where did that interview take place?

22  A.   It took place in Gatlinburg, Tennessee.

23  Q.   And during the course of that -- well, first of all, were

24  you present during that interview?

25  A.   No, sir, I was not.

M. Thomas/Direct Examination (Helland)

1    Q.    Okay.  Two other agents of the FBI were?

2    A.    Yes, sir.

3    Q.    Have you had a chance both to review their memorandum of

4    that interview and to speak with those agents regarding that

5    interview?

6    A.    Yes, I have.

7    Q.    Okay.  During the course of that interview, was Mr. Assi

8    asked again about the equipment that he was exporting?

9    A.    Yes, he was.

10   Q.    And what, if anything, did Mr. Assi have to say about the

11   equipment at this time?

12   A.    He said that he realized that there was restrictions on

13   exporting this equipment, and that he was exporting it to

14   Lebanon for an individual by the name of Hassan.

15   Q.    Did he describe what the purpose of this equipment was

16   supposed to be in Lebanon?

17   A.    He said it would be used for Hizballah.

18   Q.    Sir, based on your work in foreign counter-intelligence,

19   what do you understand Hizballah to be?

20   A.    A terrorist organization.

21   Q.    Based where?

22   A.    Based in Beirut, Lebanon.

23   Q.    And what do you understand to be the purpose of

24   Hizballah?

25              MR. STEINGOLD:  Your Honor, objection.  I'm not sure

M. Thomas/Direct Examination (Helland)

1   of the foundation or the relevance of this agent's

2   understanding of the purpose of Hizballah.

3          MR. HELLAND:  Well, the foundation is his work in

4   foreign counter-intelligence, your Honor, and the relevance --

5          MR. STEINGOLD:  I -- I would ask a foundation be

6   laid through the witness, not through Mr. Helland.

7          THE COURT:  There were no facts, just a conclusion.

8          MR. HELLAND:  Preliminary to my first question

9   regarding Hizballah was based on his experience in foreign

10  counter-intelligence.  Would you like more of a foundation

11  than that?

12         THE COURT:  Well, no, we'll let Mr. Steingold cross-

13  examine on that issue.

14         And the question is how -- how he knows?  Is that

15  the grounds for the objection?

16         MR. STEINGOLD:  Well, it was kind of a compound

17  question and compound objection, but specifically he asked the

18  agent his understanding of what the purpose of Hizballah is,

19  and for that I would want not only a foundation, but I would

20  also object to the relevancy as to what his understanding was.

21  We're here for a detention hearing.  His understanding of what

22  the purpose of Hizballah is, I don't see how that bears on the

23  issue to be decided by your Honor.

24         MR. HELLAND:  Your Honor, I'll come at it from a

25  slightly different way.

22

M. Thomas/Direct Examination (Helland)

1   BY MR. HELLAND:

2   Q.   Agent Thomas, is it your understanding, based on your

3   experience, that Hizballah has been designated by the

4   Secretary of State as a terrorist organization?

5   A.   Yes, sir, it has.

6   Q.   Okay.  And I'm sorry, I've lost my train of thought

7   slightly.  Did Mr. Assi explain to the agents interviewing him

8   on July 17th in particular how the global positioning modules

9   and thermal imaging camera were intended to be used?

10  A.   He again indicated they would be used in an unmanned

11  aerial vehicle or aircraft for surveillance.

12  Q.   Okay.  And did he also indicate how the night vision

13  equipment was supposed to be used?

14  A.   Again, for surveillance.

15  Q.   Did -- was Mr. Assi asked whether this was the first time

16  he had caused items to go to Hizballah in Lebanon?

17  A.   Yes, it was, and Mr. Assi indicated that he had sent

18  other equipment to Lebanon via friends and other travelers

19  going to Lebanon.

20  Q.   And what kind of other equipment had he sent?

21  A.   Videos on electronic surveillance techniques, books on

22  surveillance techniques, two bulletproof vests.

23  Q.   Did Mr. Assi -- was Mr. Assi asked how it is that he came

24  to be involved in the export of these items?

25  A.   Yes, he was.

23

M. Thomas/Direct Examination (Helland)

1  Q.   And what did he say about that?

2  A.   He said that an individual by the name of Karem Sabre had

3  introduced him to Hassan.  I believe Mr. Assi and Karem were

4  friends here in the United States, and Mr. Sabre had recently

5  -- or had returned to Lebanon and knew of Mr. Assi's knowledge

6  in aircraft design.  And he indicated to this individual

7  Hassan, who inquired to Karem, of where he could possibly

8  obtain these types of equipment, and Karem recommended that he

9  contact Mr. Assi.  And then Mr. -- this Hassan, last name

10  unknown, contacted Mr. Assi to inquire or request that he

11  procure these items -- items for him.

12  Q.   Did Mr. Assi indicate approximately when it was that he

13  was first contacted regarding obtaining these items?

14  A.   Approximately two years ago.

15  Q.   Did Mr. Assi indicate how it was that the financial

16  arrangements were worked for these items?

17  A.   He indicated that, again, money was brought back with his

18  brother Sami, as well as other individuals who were traveling

19  back and forth from Lebanon.  Mr. Assi also indicated that he

20  fronted some of his own money to purchase these items, and

21  then would later be reimbursed.

22  Q.   Did he indicate how it was that he had arranged for some

23  of these items to go to Lebanon before this particular

24  shipment?

25  A.   He indicated that he would give the packages to other

24

M. Thomas/Direct Examination (Helland)

1    individuals traveling to Lebanon.  He would wrap the packages

2    as -- so the identity of the items would not be known to the

3    person who was shipping them.

4    Q.    I believe you stated that during the interview Mr. Assi

5    stated that he did not know the last name of Hassan; is that

6    correct?

7    A.    During this interview, that is correct.

8    Q.    Did there come a time during the interview when he

9    changed his position on that?

10   A.    During that interview, no.

11   Q.    Okay.  Did there -- was there a later interview at which

12   he changed his position on his knowledge of Hassan's last

13   name?

14   A.    Yes, he did.

15   Q.    Did -- was Mr. Assi asked during this interview if he was

16   aware who it was that Hassan worked for in Lebanon?

17   A.    Yes, he was.

18   Q.    And what did he say about that?

19   A.    He indicated this Hassan either worked for Hizballah or

20   some type of security police, and then later referred to it as

21   Hizballah.

22   Q.    And was Mr. Assi asked why it was that he was willing to

23   engage in these activities on behalf of Hassan?

24   A.    He felt that he was obligated to do this because of

25   Hassan's position within this organization or his standing

M. Thomas/Direct Examination (Helland)

1   within this organization; he felt an obligation to that.  And

2   also supported what was going on in southern Lebanon.

3   Q.   Was that his words, "what was going on," or did he

4   explain it more fully than that?

5   A.   I cannot recall.  Again, I wasn't present during that --

6   I just -- I'd have to look at the notes.

7           MR. STEINGOLD:  Your Honor, if all the witness is

8   going to do is repeat what is in those reports, if he wasn't

9   there, if it would help any, shorten the time, I have no

10  objection to his just reading.  It's what somebody else said

11  anyhow.

12          THE COURT:  It is what somebody else said.  It's

13  certainly not his recollection.

14          MR. HELLAND:  That's correct, your Honor.  I think

15  paraphrasing would be easier than reading, so if we give him a

16  moment, I think he can paraphrase most efficiently.

17          MR. STEINGOLD:  We can just have the Court read it,

18  and save the time with his having to repeat it.  Whatever.

19          THE COURT:  Mr. Steingold's going to get an

20  opportunity to look at it anyway; right?

21          MR. HELLAND:  He already has seen it, your Honor.

22          THE COURT:  Okay.  Well, go ahead and read what you

23  consider the relevant part, but it's kind of lengthy, so don't

24  feel like you need to read the whole thing.

25          THE WITNESS:  Assi felt an obligation to help

26

M. Thomas/Direct Examination (Helland)

1  Hassan, last name unknown, based both upon Hassan's status in

2  Hizballah and Assi's desire to see Israel forced out of

3  southern Lebanon.  At some point in the past two years Hassan

4  told Assi that the equipment Hassan asked Assi to procure

5  would be used in surveillance and security measures against

6  the Israelis in southern Lebanon.  Hassan told Assi that

7  Hizballah wanted to build an unmanned surveillance aircraft

8  out of some of the equipment Assi supplied Hassan.

9          Assi discussed both his political standing and

10  reputation.  He felt Hizballah made mistakes early on by

11  attacking innocent people to include American targets.  He

12  believed that Hizballah had matured and was representing the

13  values of the people, similar to some of the religious

14  political groups in the U.S.

15      (Discussion off the record.)

16  BY MR. HELLAND:

17  Q.   Agent Thomas, let me ask you, while this surveillance was

18  -- following Mr. Assi's release at the airport on July 13th,

19  and before he left for Tennessee, did the surveillance detect

20  him doing anything else?

21  A.   Yes, sir, they did.

22  Q.   Would you please describe for the Court what it is that

23  he was seen doing?

24  A.   They seen Mr. Assi --

25  Q.   And when, if you can tell us; if you can tell us when.

27

M. Thomas/Direct Examination (Helland)

1    A.    I believe it was on 7-14, July 14th, the day after the

2    detention of the equipment by Customs, Mr. Assi was seen

3    discarding several boxes of items into trash Dumpsters around

4    Ford Road and Fairlane, Ford and Fairlane area.  He was also

5    seen bringing a box of equipment, unknown equipment to his

6    sister-in-law's house, or sister's house.

7    Q.    And how many different Dumpsters did Mr. Assi discard

8    items into?

9    A.    Two different locations.

10   Q.    And did the surveillance agents recover those items?

11   A.    Yes, sir, they did.

12   Q.    Was Mr. Assi asked about his discarding those items

13   during the interview of July 17th?

14   A.    Yes, he was.

15   Q.    And what, if anything, did he say about that?

16   A.    Mr. Assi indicated that he discarded those items because

17   he felt the FBI would be coming to -- to search his home,

18   possibly, and he felt these items were not a good thing for

19   him to be found with in his possession.

20   Q.    The items that were recovered from the Dumpsters, are you

21   familiar with them?

22   A.    Yes, I am.

23   Q.    And could you please briefly describe for the Court the

24   nature of the items that were recovered?

25   A.    There was articles and literature on unmanned vehicles,

M. Thomas/Direct Examination (Helland)

1    global positioning systems, night vision devices, thermal

2    imaging scopes, various personal papers.  There was literature

3    on Israeli cabinet members, their locations, where they're

4    located in Israel.  There was books on Israeli culture.  And

5    that's what I can recollect at this time of various items.

6    Q.    Agent Thomas, were there also searches conducted of

7    different locations with which Mr. Assi is connected?

8    A.    Yes, there were.

9    Q.    In one of those searches, was a photograph recovered?

10   A.    Yes, there was.

11   Q.    And can you describe for the Court that photograph?

12   A.    The photograph was of an individual, it appeared to be a

13   Caucasian male with a mustache, curly dark hair, standing

14   outside next to some type of piece of old antique military

15   equipment, possibly a wagon wheel.

16   Q.    Was there any identifying information on the photograph?

17   A.    On the back of the photograph was in Arabic written

18   Hussein Hassan, the name Hussein Hassan.

19   Q.    Did there come a time when Mr. Assi was interviewed a

20   third time?

21   A.    Yes, there was.

22   Q.    And when was that third time?

23   A.    I believe the date was 7-22.  July 22nd.

24   Q.    Again, just for the purpose of making sure the dates are

25   accurate --

29

M. Thomas/Direct Examination (Helland)

1   A.   Again, the transcription was on 7-22; the interview was
2   on 7-21.
3   Q.   Did you participate in that interview?
4   A.   Yes, I did.
5   Q.   During the course of that interview, was Mr. Assi asked
6   again whether he knew the last (sic) name of Hassan?
7   A.   He was.
8   Q.   And what was his initial response?
9   A.   He did not know.
10  Q.   During that interview did he give a physical description
11  of Hassan?
12  A.   Yes, he did.
13  Q.   And what was the physical description?
14  A.   The physical description was a Caucasian male,
15  approximately five-foot-seven, I believe, brown hair, straight
16  brown hair.
17  Q.   Straight brown hair?
18  A.   Yes.
19  Q.   Okay.  Did there come a time when Mr. Assi acknowledged
20  that in fact he did know Hassan's last (sic) name?
21  A.   Yes, it did.
22  Q.   How did that come about?
23  A.   Mr. Assi was shown the photograph, and asked if this was
24  the person who was procuring -- that he was procuring the
25  items for, and Mr. Assi identified that individual as Hussein

30

M. Thomas/Direct Examination (Helland)

1   Hassan.

2   Q.   And did Mr. Assi indicate --

3           THE COURT:  Yes, but that wasn't the answer to the

4   question.  I mean --

5   BY MR. HELLAND:

6   Q.   Did -- did Mr. Assi indicate that he had known this

7   person as Hussein Hassan?

8   A.   Yes, he did.

9   Q.   And did he indicate whether he had deliberately withheld

10  Hassan's last (sic) name from the investigating agents?

11  A.   Yes, he did.

12  Q.   Okay.

13          THE COURT:  Is his first name Hassan or his last

14  name Hassan?

15          THE WITNESS:  Your Honor, I believe the first name

16  is Hussein Hassan, last name Hassan.

17          MR. HELLAND:  Okay.  Then I've been doing this

18  backwards throughout.

19          THE COURT:  So the person, the Hassan, you didn't

20  know if that was a first name or a last name; or you did?

21          THE WITNESS:  At the time we didn't until we found

22  the photograph, your Honor.

23          THE COURT:  Okay.

24  BY MR. HELLAND:

25  Q.   Had Mr. Assi been asked before this interview on the --

31

M. Thomas/Direct Examination (Helland)

1   on the 21st, had Mr. Assi been asked whether there was anybody
2   else present at his initial meeting with Hassan?
3   A.   Yes, he did.
4   Q.   And what was his initial response to that question?
5   A.   No, there was no one else present.
6   Q.   And did there come a time during the interview of the
7   21st when Mr. Hassan -- or Mr. Assi changed his answer to that
8   question?
9   A.   Yes, there was.  He did identify another individual who
10  was there.
11  Q.   And who was that other individual?
12  A.   An individual he identified as Ibrahim Zein.
13  Q.   And how did it come about that Mr. Assi changed his
14  answer to that question?
15  A.   Mr. Assi, when we asked him, you know, why didn't you
16  identify these individuals before or by name, he indicated to
17  us that he was in fear that this information would somehow get
18  out and these individuals would be assassinated, because of
19  their affiliation with Hizballah.
20  Q.   And how did it come about that he changed his answer and
21  ended up providing you the identity of Mr. Zein?
22  A.   He later then discussed the meeting with Hussein Hassan
23  and Mr. Zein.
24  Q.   And how did he describe Mr. Zein's --
25  A.   By --

32

M. Thomas/Direct Examination (Helland)

1        THE COURT:  Wait a minute.

2     (Discussion off the record; tape changed.)

3        THE COURT:  All right.  Would you repeat the

4  question?

5        MR. HELLAND:  I've already gone on.  I will.  Just

6  give me --

7        THE COURT:  Oh, okay.  Sorry.

8        MR. HELLAND:  No, that's okay.  Give me one moment.

9  BY MR. HELLAND:

10  Q.   Did -- did Mr. Assi describe Mr. Zein's position in the

11  organization for which Mr. Assi was acquiring this equipment?

12  A.   He did.  He described Mr. Zein as being superior to Mr.

13  Hassan, also saying that he was in charge of the area of

14  Hizballah, which was designing this vehicle, this aerial

15  unmanned vehicle.

16        THE COURT:  Who, Zein or Hassan?

17        THE WITNESS:  Zein, your Honor.

18  BY MR. HELLAND:

19  Q.   So Zein was in charge of that area, and is it your

20  understanding that Hassan worked for him?

21  A.   Correct, Hassan worked for Zein.

22  Q.   Okay.

23  A.   It was -- Mr. Assi indicated that it was Zein who had

24  given the procurement list to Hassan to forward to Mr. Assi.

25  Q.   Now, in between July 13th and the date of this interview,

33

M. Thomas/Direct Examination (Helland)

1  did you become aware whether the night vision goggles were in

2  fact on the State Department munitions control list?

3  A.    Yes, i did.

4  Q.    And what did you learn?

5  A.    I learned they were a controlled item, and required

6  licensing before export.

7  Q.    And did you make a -- did you -- were you advised by

8  United States Customs whether Mr. Assi had obtained the

9  necessary export license?

10  A.    I was advised by Customs that Mr. Assi had not obtained

11  nor filed an application for licensing.

12  Q.    Were you also able to determine whether the thermal

13  imaging camera was on the Commerce Department's export control

14  list?

15  A.    Yes, sir, I was, and it was.

16  Q.    And were you able to determine whether Mr. Assi applied

17  for or received a license to export that camera?

18  A.    Again, there was no license issued or application for.

19  Q.    During the course of your investigation, were you able to

20  determine whether Mr. Assi used his cubicle at Ford Motor

21  Company in furtherance of these activities?

22  A.    Yes, sir, we did.

23  Q.    And -- and could you please explain a little bit to the

24  Court what you were able to determine?

25  A.    We have toll records from Ford Motor Company indicating

34

M. Thomas/Direct Examination (Helland)

1  several phone calls to Lebanon from the cubicle.

2  Q.    During the course of your monitoring Mr. Assi's telephone

3  calls, were you able to determine whether he had any plans

4  with respect to relocating to Lebanon?

5  A.    Yes, there are tech cuts indicating Mr. Assi asking --

6  Q.    When you describe a tech cut, what is a tech cut?

7  A.    I'm sorry.  Electronic surveillance synopsis or verbatim

8  of what was said on -- on that day or that phone call.  There

9  was a tech cut which indicated that Mr. Assi had asked

10  individuals to start looking for some property -- I believe it

11  was an apartment -- for him to rent in Beirut.

12  Q.    Did Mr. Assi make any further statements about his plans

13  for Beirut?

14  A.    I believe in the same tech or thereafter, there was an

15  indication that he was going to relocate his family as well,

16  pulling his children out of school.

17  Q.    During the interview down in Tennessee on July 17th, did

18  Mr. Assi make any statement about his plans ultimately to

19  locate in Lebanon?

20  A.    I believe he made a statement to the agents that he had

21  planned on to retiring to Lebanon.

22  Q.    And did he say he was going to do that in about 15 years?

23  A.    I can't recall that.

24  Q.    I'm sorry, you can or cannot recall that?

25  A.    I cannot recall.

M. Thomas/Direct Examination (Helland)

1    Q.    Let me hand you --

2    A.    (Reviewing document.)  Yes, there was a statement made to

3    the agents that in approximately 15 years he planned to retire

4    in Lebanon.

5    Q.    And as part of making that statement, did Mr. Assi

6    explain what one of the purposes was for his going to Lebanon

7    on July 13th?

8    A.    Was to deliver the equipment that Hassan had asked him to

9    procure, and also to join I believe the Lebanese Engineering

10   Society there.

11   Q.    In the course of searching Mr. Assi's residence, did you

12   locate any documents that have a bearing on his marital

13   status?

14   A.    There was some divorce papers, I believe were filed by

15   his wife possibly.  However, in the Dumpster recovered was a

16   divorce degree, an original divorce decree, that was in --

17   recovered out of that thing that Mr. Assi discarded.

18            THE COURT:  Was that his divorce decree, or just a

19   divorce decree?

20            THE WITNESS:  His divorce decree, your Honor.

21   BY MR. HELLAND:

22   Q.    Agent Thomas, I want now to ask you about a little bit of

23   your understanding of a couple of the practices of Hizballah,

24   to the best of your knowledge.  And let me ask you first, and

25   as a foundation, in the course of investigating a matter like

M. Thomas/Direct Examination (Helland)

1   this, is it customary for you to avail yourself of the body of

2   knowledge that the FBI has amassed regarding whatever

3   organization your subject is involved in?  Do you attempt to

4   learn something about the foreign organization?

5   A.   Yes, we do.

6   Q.   Okay.  And in particular in this case, have you attempted

7   to learn something from the FBI data bases regarding the

8   Hizballah organization?

9   A.   Yes, we have.  Yes, I have.

10  Q.   Okay. And in particular have you also spoken with FBI

11  personnel who are considered experts regarding Hizballah?

12  A.   Yes, I have.

13  Q.   Okay.  Now, Agent Thomas, based on those conversations,

14  what, if anything, have you been able to determine about

15  whether or not Hizballah is a well-funded organization?

16          MR. STEINGOLD:  Your Honor, I'm going to object.

17  Number one, it would appear that Mr. Helland is attempting to

18  qualify this witness as an expert through osmosis.  In

19  addition, your Honor, having already established through the

20  witness that Hizballah is listed as a terrorist organization,

21  that is all that he needs to establish for these purposes, and

22  I'm not sure what relevance let alone the competence of this

23  witness to testify to the funding or other information

24  regarding this organization.

25          MR. HELLAND:  Two responses, your Honor.  First, I'm

37

M. Thomas/Direct Examination (Helland)

1    not attempting to qualify Agent Thomas as an expert by any

2    means.  I am, however, attempting to put before the Court

3    information which I do believe to be relevant -- I'll get to

4    that in a moment -- in the same manner in which much of the

5    other information has come before the Court; that is, Agent

6    Thomas has gathered information from a number of sources,

7    whether it be regarding interviews or in this case whether it

8    be regarding Hizballah, so he's not purporting to be an

9    expert.  He is purporting to have information which he has

10   obtained during this information, which I think the Court will

11   find relevant.

12          The relevance, your Honor, comes from the fact --

13   where I'm going with this is to show that Hizballah is a well-

14   funded organization which takes care of those who in some

15   sense suffer through their service to the organization.  In

16   particular, Hizballah has the resources and the inclination to

17   take care of Mr. Assi, were Mr. Assi to move to Lebanon.  It

18   also has the means to get Mr. Assi to Lebanon where it could

19   take care of him.  And that's where I'm headed with this.

20          THE COURT:  I think that's offered as a proffer.

21          MR. STEINGOLD:  Your Honor, I'm somewhat stunned by

22   the suggestion that there's -- we're going to hear evidence of

23   Hizballah's intention to transport my client to Lebanon.  This

24   kind of comes as a bolt out of the blue.  I thought we were

25   going to hear about in general FBI's alleged expert's opinion

M. Thomas/Direct Examination (Helland)

1  or knowledge of what Hizballah was all about.  If we're

2  talking about specific information relating to my client, I'll

3  withdraw the objection.  But if this is just a general inquiry

4  into what the FBI believes their financial capabilities or

5  transport capabilities are, I don't believe that that's

6  relevant in this case.

7           MR. HELLAND:  Your Honor, I don't want to mislead

8  Mr. Steingold or the Court.  I don't have evidence, and I

9  don't believe Mr. Thomas does, that Hizballah -- specific

10  evidence that at this time Hizballah is -- has stated an

11  intention to move Mr. Assi or take care of Mr. Assi.  However,

12  I do expect to offer evidence that the organization has a

13  practice of taking care of those who have helped it, and in

14  some sense paid a price for it.  And that's what I intend to

15  -- to proffer or to offer through Agent Thomas.

16           THE COURT:  I'll take a little bit of testimony, but

17  not --

18           MR. HELLAND:  I don't expect to go into great

19  detail, your Honor.

20           THE COURT:  Okay.  And it would be helpful if he

21  would identify the source of this information.

22  BY MR. HELLAND:

23  Q.   Agent Thomas, my first question to you has to do with the

24  funding for Hizballah.  Could you identify how you know

25  something about the funding for Hizballah, and what it is that

39

M. Thomas/Direct Examination (Helland)

1  you know about the funding for Hizballah.

2  A.   FBI National Security Unit at FBI Headquarters, I was in

3  discussion with them referencing the same question.

4  Q.   When you say "them," is there a particular person that

5  you had --

6  A.   Supervisor Special Agent Art Cummings, who is the unit

7  chief of the National Security Terrorism Section for Hizballah

8  at FBI Headquarters.

9  Q.   And what did you learn then about funding for Hizballah?

10  A.   He informed me that they are a very well financed group

11  who operates with other funds as far as they collect funds and

12  support individuals who have been -- their family members who

13  have -- martyrs who have been killed in support of the

14  conflict in Israel, funds to provide for their orphans, their

15  spouses, in the event that they're killed in the conflict.

16  Q.   Did you also ask -- I'm sorry, was it Mr. Cummings?

17  A.   Art Cummings; correct.

18  Q.   Yeah.  Did you ask Agent Cummings about Hizballah's

19  ability to relocate Mr. Assi to Lebanon?

20  A.   (No audible response.)

21  Q.   Or if you didn't ask him, do you have knowledge of that?

22  A.   I have knowledge of the Hizballah organization from

23  working other cases that they provide documentation, which

24  would be coming into the country through carriers, such as

25  illegal passports and stuff like that, to move people out of

40

M. Thomas/Direct Examination (Helland)

1   the country.

2   Q.   And what, if anything, have you been able to determine

3   regarding the status that somebody like Mr. Assi would have

4   were he to relocate to Lebanon, given his support of

5   Hizballah, as you've understood it to be in this case?

6   A.   Again, Mr. Assi would be considered very highly regarded.

7        MR. STEINGOLD:  Objection, your Honor, to what Mr.

8   Assi would be considered by another group, not the FBI.  I

9   don't know what foundation Mr. Helland can lay to establish

10  this agent's ability to state whether Hizballah would consider

11  my client an asset or at this point a threat.

12       THE COURT:  So you think it's pretty speculative; is

13  that your objection?

14       MR. STEINGOLD:  I think it's highly speculative.

15       MR. HELLAND:  Your Honor, I think there's nothing

16  speculative about it.  So whether Mr. Steinberg thinks that or

17  not, I do not.

18       THE COURT:  Well --

19       MR. STEINGOLD:  Maybe I misunderstand the question,

20  but as I understand it, he's asking this agent how Hizballah

21  views my client.

22       THE COURT:  If he were to do something, which

23  there's no evidence that he's going to do.

24       MR. HELLAND:  No.  If he has done something which

25  there's evidence that he did.

41

M. Thomas/Direct Examination (Helland)

1         THE COURT:  Well --

2         MR. STEINGOLD:  Even granting that, he is speaking

3    for Hizballah.  There needs to be some foundation.

4         THE COURT:  What I heard you ask was, if we assume

5    that Mr. Assi may return to Lebanon at some point in time --

6         MR. HELLAND:  Yes.

7         THE COURT:  -- then how is it likely that an -- that

8    this organization would view him?

9         MR. HELLAND:  No.  No.  My question was directed

10   more to not his status just within the organization, but

11   within the Lebanese community.  Would -- would his status in

12   the Lebanese community be enhanced by virtue of his having

13   supported Hizballah.

14        THE COURT:  Which Lebanese community are we talking

15   about?  Something in the United States?

16        MR. HELLAND:  No, in Lebanon.  I'm sorry, I meant --

17        THE COURT:  In something of general Lebanese?  I

18   mean I -- I guess I see this as fairly speculative.  I mean

19   within this Hizballah organization, I guess what you're trying

20   to say is that he would be -- he would have a greater status

21   by virtue of having tried to do something.

22        MR. HELLAND:  That's right.

23        THE COURT:  If he were to return there.

24        MR. HELLAND:  That's right.

25        MR. STEINGOLD:  I assume that if in the equation

42

M. Thomas/Direct Examination (Helland)

1    we're also going to have as a given the fact that my client

2    allegedly identified by name, picture, and physical -- and

3    physical characteristics the persons allegedly who admitted --

4             THE COURT:  I think it's pretty --

5             MR. STEINGOLD:  -- they were speaking on behalf of

6    Hizballah.

7             THE COURT:  I guess I think it's pretty speculative.

8    It might be appropriate for argument, but I don't see how this

9    witness can offer facts unless there's some previous

10   circumstance or something right on point, but it seems to be

11   in the nature of an unsupportable opinion.

12            MR. HELLAND:  Okay.  I won't pursue it any further

13   then, your Honor.

14            THE COURT:  I mean not every Lebanese is a member of

15   Hizballah; right?

16            MR. HELLAND:  No.  But I don't know that that

17   matters a lot to -- to the particular question.  That's okay.

18   I mean I'm not going to pursue it right now.

19            THE COURT:  Okay.

20            MR. HELLAND:  Your Honor, and I have no further

21   questions for Agent Thomas at this time.

22            THE COURT:  Okay.  Mr. Steingold.

23        (Discussion off the record.)

24

25


                                43

M. Thomas/Cross-Examination (Steingold)

**CROSS-EXAMINATION**

BY MR. STEINGOLD:

Q.   Through your investigation experience, do you have an opinion on how Hizballah would deal with people who they felt were traitors to their cause?  Do you have an opinion?

MR. HELLAND:  For that question I think we need a little different foundation.  There's no --

MR. STEINGOLD:  I just asked whether he had an opinion.  I didn't ask him what the opinion was --

THE COURT:  He can answer that question if he has an opinion.

MR. STEINGOLD:  -- or the --

THE WITNESS:  Can you please repeat the question.

BY MR. STEINGOLD:

Q.   Through your experience, training and research, do you have an opinion on how the organization you identify as Hizballah would deal with persons who they felt were traitors to their cause?

A.   In my opinion, yes, I think -- yes, I do have an opinion.

Q.   Okay.  Would it be fair to say that they would deal harshly with such an individual?

A.   Yes.

Q.   Okay.  Did you tell the Court that my client gave you the name of Hussein Hassan, described him by his physical characteristics and in fact identified a photograph?

44

M. Thomas/Cross-Examination (Steingold)

1    A.    Eventually he did, yes.

2    Q.    Okay.  And did you also tell the Court that he also gave

3    you the full name of a person called Sheikh Issam (sic) Zein,

4    identifying him as a superior to Hassan in Hizballah, and

5    giving you his physical characteristics as well?

6    A.    Again, he later did.

7    Q.    Okay.  And you would agree that providing that sort of

8    information could well be regarded by Hizballah as being

9    traitorous activity to their organization; wouldn't you agree

10   with that?

11   A.    Mr. Assi himself had indicated that --

12   Q.    The question is would you agree with what I just said?

13   A.    Yes, I would agree.

14   Q.    Okay.  Now, let's just go back.  You told the Court that

15   at the beginning, before the stop at the airport, through

16   surveillance and wire tapping, the FBI developed reason to

17   believe that Mr. Assi was involved in activity which would be

18   illegal; correct?

19   A.    Correct.

20   Q.    You knew that he had obtained items that could not be

21   exported without proper permission; correct?

22   A.    Correct.

23   Q.    Up to the point when he was stopped at the airport, did

24   the FBI have enough information to effectuate an arrest or

25   charge Mr. Assi with a crime, in your opinion?

45

M. Thomas/Cross-Examination (Steingold)

1  A.   No.

2  Q.   Okay.  But you -- in fact when you get a wire tap, you

3  just can't go into a court and say hey, we want to listen to

4  what this guy has to say; you have to make a very specific

5  showing of the information that you have that would lend a

6  magistrate to find that intercepting these --

7           THE COURT:  Actually, an Article III judge.

8           MR. STEINGOLD:  Oh, I'm sorry.

9           MR. HELLAND:  And if I might, your Honor, before Mr.

10  Steingold goes any further, this is a national security wire

11  tap, which goes before an entirely different body --

12           THE COURT:  Okay.

13           MR. HELLAND:  -- under different criteria.

14           THE COURT:  Oh, okay.  Well, that clears that up.

15           MR. STEINGOLD:  All right.  Okay.  But you've got to

16  make a showing.  You just can't go in and say we want to

17  listen.  You've got to put out some information that shows

18  that there's something here that bears further investigation.

19           THE COURT:  I think Mr. Helland is saying maybe yes,

20  maybe no, on an intercede tap.

21           MR. STEINGOLD:  Oh, okay.

22           MR. HELLAND:  And also -- yes.

23           MR. STEINGOLD:  All right.

24           THE COURT:  And in any event, he didn't do it.

25  BY MR. STEINGOLD:

46

M. Thomas/Cross-Examination (Steingold)

1  Q.   At any rate, you didn't do it; this is all -- you've been

2  told this by other people; correct?

3  A.   Yes, sir.

4  Q.   All right.  You didn't have anything to do with obtaining

5  the wire taps, did you?

6  A.   No, sir, I did not.

7  Q.   Did you listen to any of the phone calls?  Or have you

8  just been telling the Court what you have been told by other

9  agents were heard on the phone calls?

10  A.   Sir, I've read the tech cuts.

11  Q.   Okay.  When you say the tech cuts, you're saying that you

12  read the summary of the phone calls?

13  A.   Yes, sir.

14  Q.   You haven't listened to the phone calls?

15  A.   Sir, the phone calls are in Arabic.

16  Q.   All right.  Did you see a transcript of the phone calls

17  in English?

18  A.   Yes, sir.

19  Q.   Is a tech cut the actual transcript or someone's summary?

20  A.   Sir, that's the transcript, sir.

21  Q.   The actual transcript.

22  A.   Not a verbatim, sir.

23  Q.   Well, if it's not verbatim, what is it?

24          THE COURT:  It's under the close-enough-for-

25  government-work doctrine.

M. Thomas/Cross-Examination (Steingold)

1          MR. STEINGOLD:  Oh.

2    BY MR. STEINGOLD:

3    Q.    Is this an agent -- is this an agent summarizing what was

4    heard?

5    A.    No, sir.  It's a linguist, sir.

6    Q.    A linquist.  Okay.

7          THE COURT:  Oh, so it's a linguist.  It's not

8    equivalent to a 302?  Or is it?  Is it like a 302?

9          THE WITNESS:  Yes, ma'am, I believe it -- I mean

10   it's a log of what the calls were, who they were to, what was

11   said, and then it is filed into a classified file.

12         THE COURT:  Okay.

13   BY MR. STEINGOLD:

14   Q.    Now, you told us that you learned of Mr. Assi's intention

15   to export these items in the week prior to his departure;

16   correct?

17   A.    I did, yes, sir.

18   Q.    You personally learned, or -- or you testified that it

19   had been learned?

20   A.    I had learned, sir.

21   Q.    All right.  How did you learn?

22   A.    Through the tech cuts, sir.

23   Q.    Well, it -- so by reading the tech cuts, you learned that

24   he was going to leave on June 13th -- July 13th with these

25   items; correct?

M. Thomas/Cross-Examination (Steingold)

1   A.   Yes, sir.

2   Q.   And you had enough information at that point certainly to

3   charge him with attempting to violate the statute, didn't you?

4          MR. HELLAND:  Your Honor, I think that's a legal

5   question.  I'm not sure the agent is in a position to answer

6   it.

7   BY MR. STEINGOLD:

8   Q.   Well, did you feel that you had enough information to

9   arrest him at that point?

10   A.   I can't -- I mean --

11   Q.   Okay.

12   A.   I don't make those determinations, sir.

13   Q.   All right.  And you say that he went to the airport on

14   July 13th, and that's where he was stopped; correct?

15   A.   Correct, sir.

16   Q.   And you told this Court that he was on his way to

17   Lebanon; is that right?

18   A.   Sir, I believe his exact flight -- his destination was

19   Lebanon.  His exact flight, I believe he was boarding aircraft

20   for Frankfurt, Germany, sir.

21   Q.   All right.  That's what I wanted to bring out.  You can't

22   fly directly from the United States to Lebanon, can you?

23   A.   I -- I can't answer that, sir.  I'm sure there are --

24   there are -- I don't know, sir.

25   Q.   And Mr. Assi was taken away at the airport on his way to

M. Thomas/Cross-Examination (Steingold)

1   a flight to Frankfurt, Germany; correct?

2   A.   That is correct, sir.

3   Q.   Did he have tickets in his possession from Germany to

4   Lebanon?

5   A.   I can't answer that, sir.

6   Q.   Well, tell the Court what basis you have in stating that

7   at that point, when he was stopped, his destination was

8   Lebanon.

9   A.   Sir, we have tech cuts with his travel agent calling him,

10  laying out his exact itinerary, sir.

11  Q.   Okay.  Do you have any of these tech cuts here with you?

12  A.   No, sir.

13  Q.   Okay.  So he was stopped on July 13th at the airport and

14  found in his possession, both in his carry-on luggage as well

15  as his checked-in luggage, items that could not legally --

16  legally be exported; correct?

17  A.   Sir, at the time he was detained, they had -- those items

18  had to be checked through the State Department to determine

19  licensing requirements.  They were suspected to be non-

20  exportable items, sir.

21  Q.   They weren't just suspected of being non-exportable

22  items; didn't you know they were non-exportable items at that

23  point?

24  A.   No, sir, I did not.

25  Q.   Didn't the agent who intercepted him at the airport