M. Thomas/Cross-Examination (Steingold)

1   indicate to you that there were labels right on the equipment

2   indicating that they could not be exported?

3   A.    That is correct.  Yes, sir.

4   Q.    So they -- the agents knew that these items were not

5   exportable because it says so right there on the label;

6   correct?

7   A.    Again, sir, I can't speak for how another agency handles

8   their protocol.  I mean -- I'm assuming that the label did

9   indicate clearly that they weren't to be exported, but I'm

10  sure that there's some type of verification process, and I

11  can't speak for another agency on their verification process.

12  Q.    Did you prepare an affidavit in support of this

13  complaint?

14  A.    Yes, sir, I did.

15  Q.    And didn't you put on there that the United States

16  Customs agent advised you that he had examined the regulations

17  applicable to exports of military equipment, and had verified

18  that Assi was required to obtain from the State Department an

19  export license before exporting the night vision goggles?

20  A.    Yes, sir, I did.

21  Q.    All right.  So when they stopped him at the airport, you

22  not only had whatever information you had from these tech

23  cuts, but you now had him actually attempting to board a

24  vehicle with items that right on its face said you can't take

25  this out of the country; right?

M. Thomas/Cross-Examination (Steingold)

1   A.   Yes, sir.

2   Q.   And he could have been arrested and charged with this

3   offense right then, couldn't he?

4   A.   Again, sir, I can't answer how another agency handles

5   their -- their protocol.  I'm sure there has to be some type

6   of verification process to insure that item, that

7   specification, that model is the restricted item, sir.

8   Q.   Now, Agent Thomas, if you find someone about to leave the

9   country with contraband, for instance cocaine in their

10  possession, you can arrest them right there, can't you?

11  A.   Sir, I believe there has to be some type of testing of

12  that cocaine prior to that.  I'm sure there's detention.  But

13  I don't work drugs, sir.

14  Q.   But -- okay.  Let's say that you, as an FBI agent,

15  somehow stop someone on an outboard flight going -- some

16  outbound flight to some other country, and they have some

17  illegal contraband in their possession.

18          MR. HELLAND:  Your Honor, this is --

19  BY MR. STEINGOLD:

20  Q.   Could you effectuate an arrest right there?

21          MR. HELLAND:  I don't believe there's any relevance

22  to this line of inquiry, and I think we've spent enough time

23  on it already.

24          MR. STEINGOLD:  Well, I think there is.

25          THE COURT:  Well, it -- it --

M. Thomas/Cross-Examination (Steingold)

1    MR. STEINGOLD:  Your Honor, we're talking here about

2  detention and what the Government is supposed to show is a

3  risk of flight or danger to the community, and what I'm

4  attempting to show is that despite the fact that they claim to

5  have found this man basically red-handed, they just let him

6  walk away.  And I think it bears on whether or not the

7  Government viewed him as a danger to the community or a risk

8  of flight.

9    THE COURT:  An interesting argument.

10    MR. HELLAND:  And I can cut it short, if you like,

11  your Honor.  If you'll allow me to address this question.

12    THE COURT:  Make a proffer.  Why don't we make a

13  proffer.

14    MR. HELLAND:  I'll make a proffer.  Before criminal

15  proceedings could be commenced regarding -- let me step back.

16  The information on which the complaint is based was foreign

17  intelligence information, resulting from the foreign

18  intelligence of wire tap.  Before that information can be used

19  in any criminal proceeding, the Attorney General has to

20  authorize it.  The Attorney General did not authorize that

21  until -- was it two nights ago?  No, yesterday morning?

22    THE WITNESS:  Yesterday morning, sir.

23    MR. HELLAND:  Okay.  Between the time Mr. Assi was

24  detained at the airport and the time that he was ultimately

25  arrested following the issuance of the complaint yesterday,

53

M. Thomas/Cross-Examination (Steingold)

1   which followed the Attorney General signing off on this

2   yesterday morning, Mr. Assi was under constant 24-hour

3   surveillance wherever he went.

4           So to state that the Government considered him not a

5   danger either to leave or to the community, and that's shown

6   by the Government's decision not to arrest, and the Government

7   just let him go, those are all incorrect factual premises,

8   your Honor.

9           THE COURT:  All right.

10          MR. STEINGOLD:  Your Honor, being unable to cross-

11  examine Mr. Helland, I'm at a loss to really contest these

12  allegations, but if he is pretending to --

13          THE COURT:  Well, that's the proffer.

14          MR. STEINGOLD:  -- he's made a proffer with no -- I

15  mean we don't know when this surveillance began --

16          THE COURT:  Well, now wait, wait --

17          MR. STEINGOLD:  -- we don't know what --

18          THE COURT:  -- wait, wait, wait.  First of all, Mr.

19  Helland has made a proffer as an officer of the court with

20  respect to the conduct of the Attorney General and the timing

21  and the legal requirements within the Office of the United

22  States Attorney and the Department of Justice.  I take that as

23  a truthful representation.

24          MR. STEINGOLD:  As do I.

25          THE COURT:  With respect to this factual allegations

M. Thomas/Cross-Examination (Steingold)

1  as to when their surveillance began, if that were the reason

2  that the arrest was delayed, et cetera, et cetera, you may

3  cross-examine this witness on that.

4          MR. STEINGOLD:  That -- that is the problem that I

5  have.  Thank you, your Honor.

6          THE COURT:  Well, ask the witness.  If he doesn't

7  know, say so.

8  BY MR. STEINGOLD:

9  Q.   Well, do you know when 24-hour surveillance was begun on

10 Mr. Assi?  Do you know?

11 A.   No, I cannot specify the exact time and date it was

12 initiated.

13 Q.   Do you know whether he was on constant surveillance from

14 the point when he was allowed to leave the airport?

15 A.   Yes, he was.

16 Q.   At what point?  From the moment he left the airport?

17 A.   He was on surveillance, yes.

18 Q.   From what point?

19 A.   He was on surveillance on his way to the airport.

20 Q.   And they never left?  That is to say, the surveillance

21 continued non-stop from the point he left the airport?

22 A.   I would say yes.  Yes, he was on surveillance.

23 Q.   Well, you say yes.  You hesitated.  Are you -- are you

24 guessing that he was?  Or are you telling the Court that you

25 have information that he was on a constant, 24-hour watch from

55

M. Thomas/Cross-Examination (Steingold)

1  before he went to the airport, and that it never ceased?

2  A.   I didn't say he was on a 24-hour surveillance prior to

3  him arriving at the airport.   I said he was on surveillance

4  when he arrived at the airport.   He was on 24-hour

5  surveillance after he left the airport.

6  Q.   From the point where he left the airport, or some point

7  after that?

8  A.   From the point he left the airport.

9  Q.   And how do you know that?

10  A.   I was in contact with surveillance units.

11  Q.   Okay.   Were you at the airport?

12  A.   Yes, I was.

13  Q.   You were there when he was stopped at the airport?

14  A.   Yes.

15  Q.   Did you see the items that he was found with?

16  A.   When he was initially stopped?

17  Q.   Yeah.

18  A.   No.   No.   But I did see the items later in the evening.

19  Q.   Did you feel that his having been found in possession of

20  these items at the airport would justify your arresting and

21  detaining him right there?

22  A.   No, I didn't.

23  Q.   Even though he was found with these items that you knew

24  were not exportable and said right on it you can't take this

25  out of the country?

M. Thomas/Cross-Examination (Steingold)

1    A.    Again, sir, that was a different agency.

2    Q.    But you were there as well.  This was part of your

3    surveillance; correct?

4    A.    Correct, sir.  But my -- I was just there with -- as part

5    of surveillance.  I mean, to see what was going on.  But I was

6    not part of the --

7    Q.    The other agency was intervening --

8    A.    -- seizing the --

9    Q.    The other agency was intervening at the FBI's request;

10   correct?

11   A.    Correct.

12   Q.    I mean you told the agent to stop this individual and

13   check what he has because you think he's taking stuff out of

14   the country that's not allowed to be taken out of the country;

15   correct?

16   A.    We advised Customs.

17   Q.    And they stopped him and they found stuff that you

18   believed wasn't supposed to go out of the country; correct?

19   A.    Correct.

20   Q.    Items that from your prior investigation you had

21   determined he knew couldn't go out of the country; correct?

22   A.    I don't know if we knew prior to that that he knew that

23   they were not exportable.

24   Q.    At any rate, he was allowed to leave; right?

25   A.    Yes.

57

M. Thomas/Cross-Examination (Steingold)

1  Q.   From the airport.  And you say he was on surveillance
2  from the point he left the airport; correct?
3  A.   Correct.
4  Q.   He was not advised that he was on surveillance though,
5  was he?
6  A.   No, he was not.
7  Q.   All right.  Now, you told the Court about this camera
8  that's used to pick up body heat; correct?
9  A.   Correct.
10 Q.   There are multiple uses for that sort of camera, aren't
11 there?
12 A.   I'm sure there are, sir.
13 Q.   And some of them -- for instance there's medical use for
14 that, isn't there?
15         THE COURT:  Medical use for what?
16         MR. STEINGOLD:  For the camera.
17         THE COURT:  The heat-seeking camera?
18         MR. STEINGOLD:  Yeah.
19 BY MR. STEINGOLD:
20 Q.   You know that from your experience in the military, don't
21 you?
22 A.   I'm unaware of medical, sir.
23 Q.   All right.
24         THE COURT:  Is this a camera that takes a still
25 picture, or is this a video camera?

58

M. Thomas/Cross-Examination (Steingold)

1          THE WITNESS:  Your Honor, it's like a video camera,

2   your Honor.  It has the capability to record what it sees, but

3   it is a thermal imaging scope, with the capability to record.

4          THE COURT:  So it's incorrect to call it a camera?

5          THE WITNESS:  I'm not sure the exact nomenclature on

6   it, your Honor.  If it's a camera.

7   BY MR. STEINGOLD:

8   Q.   Couldn't it be used to identify wounded bodies in the

9   dark?

10  A.   It could be used to identify any type of body in the

11  dark, sir.

12  Q.   It could be used to identify anything that gave off heat;

13  correct?

14  A.   Yes, sir.

15  Q.   It could be used, for instance, to detect land mines,

16  couldn't it?

17  A.   Sir, I don't know that.

18         THE COURT:  Or fugitives in North Carolina.

19         THE WITNESS:  Yes, ma'am.

20  BY MR. STEINGOLD:

21  Q.   Now, you talked about two interviews that Agent Steinbach

22  claimed to have had at the airport with Mr. Assi; correct?

23  A.   I don't believe there was two interviews.  I think there

24  was an initial question -- questioning of Mr. Assi, and then

25  there was an interview.

M. Thomas/Cross-Examination (Steingold)

1   Q.   You were not present for any of them; correct?

2   A.   Correct.

3   Q.   This was not recorded, was it?

4   A.   I don't know if Agent Steinbach recorded it or not.

5   Q.   Was there any statement signed by Mr. Assi?

6   A.   I don't believe -- I can't answer that, I don't know.   I

7   don't believe so.

8   Q.   All right.  But both of these occasions when Agent

9   Steinbach talked to Mr. Assi were on July 13th; is that

10  correct?

11  A.   Correct.

12  Q.   Now, once he was released, you guys kept following him;

13  correct?

14  A.   Correct.

15  Q.   And he was asked, even though you didn't feel you had a

16  reason, a basis for arresting him at the time, he was asked to

17  let the agent know if he had any plans whatsoever to leave the

18  Detroit area; correct?

19  A.   I don't know if Agent Steinbach directed that question or

20  if Mr. Assi volunteered that.

21  Q.   All right.  And in fact --

22  A.   But I do know that was stated.

23  Q.   I thought you told us that he was supposed to contact Mr.

24  -- Agent Steinbach, and that he in fact did so, and told Agent

25  Steinbach that he was taking his family on vacation to the

M. Thomas/Cross-Examination (Steingold)

1   Smoky Mountains?

2   A.   That is correct.

3   Q.   All right.  Now, you didn't -- no one called and said,

4   hey, are you going anywhere.  That was Mr. Assi calling and

5   advising you guys when he was planning on going on a family

6   vacation; correct?

7   A.   That's correct, sir.

8   Q.   Who did he go with?

9   A.   I believe he was with his wife and his children.

10  Q.   His wife?  The same wife that you found this divorce

11  decree about; correct?

12  A.   I presume it's the same woman.

13  Q.   Where -- where is that woman living?

14  A.   I presume with Mr. Assi.

15  Q.   You know that he is living with that lady and their

16  children, don't you?

17  A.   Yes, sir.

18  Q.   And in fact they were all going on this family vacation

19  together, and he called to tell the federal government, this

20  is where I'm going?

21  A.   Yes, sir.

22  Q.   Did you guys know that he was preparing to leave?

23  A.   Prior to his phone call?

24  Q.   Yeah.  I mean --

25  A.   Yes, we picked it up on a tech cut.

M. Thomas/Cross-Examination (Steingold)

1  Q.   You're saying that for certain, you read that on a tech

2  cut?

3  A.   Yes.

4  Q.   So you knew when he was leaving and where he was going?

5  A.   I'm not sure if we knew he was -- where exactly he was

6  going, but we knew he was going someplace.

7  Q.   In any of these tech cuts that you had received up till

8  then, are you telling the Court that there was discussion

9  regarding the Hizballah?

10  A.   Again, without reviewing all the tech cuts, I cannot

11  specify exactly what was said on -- on tech cuts.

12  Q.   All right.  So he told you he was leaving and he told you

13  he was going to the Smoky Mountains, and you guys followed

14  him; correct?

15  A.   Us guys being the FBI; yes, sir.

16  Q.   I'm sorry, the FBI was following him.

17  A.   Yes, sir.

18  Q.   And at that point it wasn't a secret surveillance; you

19  made no attempt -- the FBI made no attempt to conceal they're

20  following Mr. Assi; isn't that correct?

21  A.   The initial intent was to be covert in the surveillance,

22  but it became too difficult, obviously, traveling through

23  states in darkness, and the decision was made to -- to become

24  closer to Mr. Assi's vehicle, and I'm sure he was aware of his

25  surveillance.

M. Thomas/Cross-Examination (Steingold)

1  Q.   Aware because the agents would take turns driving up next

2  to his car and looking in and basically surrounding him all

3  the way down; is that right?

4  A.   I can't answer that, sir.  I wasn't on the surveillance.

5  Q.   In fact, didn't he stop at some point and come up to the

6  car and say, why are you following me?  If you want to talk to

7  me, talk to me, but let me take my family on a vacation in

8  peace?  Did that ever happen?

9  A.   Sir, I don't know.

10 Q.   You weren't part of that surveillance?

11 A.   No, sir, I was not.

12 Q.   Were you ever advised that there was a conversation

13 between my client and the agents somewhere before Gatlinburg?

14 A.   No, sir, I was not.

15 Q.   In fact, have you ever been advised that when they were

16 still in Detroit and the surveillance became known, before

17 they left Mr. Assi went to the agent and said, why are you

18 following me?  If you want to talk to me, take me and let's

19 talk right now?

20 A.   No, sir, I wasn't aware of that.

21 Q.   Were you aware of whether or not the -- any agents left

22 Mr. Assi at that point to go and see if that could be

23 arranged?

24 A.   If what could be arranged, sir?

25       THE COURT:  The interview.

M. Thomas/Cross-Examination (Steingold)

1   BY MR. STEINGOLD:

2   Q.   Did any of these surveillance agents tell you that they

3   had a conversation with my client in Knoxville, Tennessee,

4   where he went up to them and said, why are you following like

5   this?  Let's talk.

6            MR. HELLAND:  Your Honor, I'm not sure we got an

7   answer to the previous question.

8            MR. STEINGOLD:  Oh, I'm sorry.

9            THE COURT:  You asked first about prior to leaving

10  Detroit.

11           MR. STEINGOLD:  Right.  And now I'm asking about --

12           THE WITNESS:  No, I'm not aware of that.

13  BY MR. STEINGOLD:

14  Q.   How was this interview in Gatlinburg arranged?

15  A.   I believe Mr. Assi was approached by two agents and asked

16  to talk.

17  Q.   You believe that?  Based on what?

18  A.   On the conversations with the agents who conducted the

19  interview.

20  Q.   And you were never advised that Mr. Assi confronted the

21  agents at two points before Gatlinburg?

22  A.   I don't know if he confronted agents or surveillance

23  personnel.

24  Q.   Now, you basically summarized what happened in that

25  interview in Gatlinburg based on what you were told by other

64

M. Thomas/Cross-Examination (Steingold)

1  agents and what you've read; correct?

2  A.    Correct.

3  Q.    Because you were not there?

4  A.    Correct.

5  Q.    And this was not recorded?

6  A.    Correct.

7  Q.    And there is nothing in the nature of a statement signed

8  by Mr. Assi, is there?

9  A.    No, sir, there's not.

10  Q.    Now at this point he was certainly the focus of an

11  investigation, wasn't he?

12  A.    Yes, sir, he was.

13  Q.    In fact you were trying to develop enough information to

14  effectuate the arrest if you didn't already have -- have

15  enough information; correct?

16  A.    Correct.

17  Q.    Mr. Assi was never advised of any -- any rights that he

18  had not to make a statement, did he?

19  A.    Mr. Assi was never in custody.

20  Q.    I didn't ask whether he was in custody.

21  A.    No, he was never advised of any rights.

22  Q.    All right.  And during that interview on the 17th you

23  told the Court that Mr. Assi basically confessed; right?

24  A.    Correct.

25  Q.    I mean he not only told you, according to what you had

65

M. Thomas/Cross-Examination (Steingold)

1    been told, that he was sending this stuff to Lebanon, thinking

2    it was going to the Hizballah, but he listed for you some

3    items that he apparently indicated had previously been sent to

4    Lebanon; correct?

5    A.   He listed it for those two agents conducting the

6    interview; correct.

7    Q.   Correct.  And according to what your report indicates, he

8    told you that he knew it was illegal and he was willing to

9    take that risk; correct?

10   A.   Correct.

11   Q.   Did you arrest him at that time?

12   A.   No, we did not.

13   Q.   You certainly had enough information to arrest him at

14   that point, didn't you?

15   A.   I don't know, sir.

16   Q.   You don't know?

17   A.   I don't know if had the determinations back at that

18   point.

19   Q.   Well, let me understand this.  You have him at the

20   airport about to board an outbound flight to Frankfurt, in

21   possession of items that -- that you can't take the stuff out

22   of the country; correct?

23   A.   Correct.

24   Q.   You knew from your other investigation that he was taking

25   this stuff to Lebanon; correct?

M. Thomas/Cross-Examination (Steingold)

1  A.   Correct.

2  Q.   And now you have an admission that he knew that the items

3  were going to used to support Hizballah; correct?

4  A.   Correct.

5  Q.   And you're telling the Court that you know whether you

6  had enough information to arrest him at that time?

7  A.   We still did not have Attorney General's approval to

8  release the information that we had, sir.

9  Q.   And after he gave you these statements in Gatlinburg, he

10  was allowed to leave?

11  A.   Correct.

12  Q.   And proceed on his family vacation?

13  A.   Correct.

14  Q.   Had total freedom?

15  A.   Yes, sir.

16  Q.   Now, tell me, in your surveillance up to this time, was

17  there ever an occasion where Mr. Assi attempted to leave the

18  Detroit area, other than when he told you he was going to the

19  Smoky Mountains?

20  A.   Sir, he had made calls to a travel agent to get him to go

21  to Lebanon, another flight to Lebanon.

22  Q.   When?

23  A.   Subsequent to his detention by Customs.

24  Q.   And when --

25        THE DEFENDANT:  Because they told me to --

67

M. Thomas/Cross-Examination (Steingold)

1    THE WITNESS:  But he did inform -- I mean he

2   informed, I believe maybe it was Agent Steinbach or --

3    THE DEFENDANT:  And then they told me it was okay.

4   BY MR. STEINGOLD:

5   Q.   He told them -- he told them that he was going to go to

6   Lebanon; correct?

7   A.   Correct.

8   Q.   All right.  So he didn't hide his intention to still try

9   to go to Lebanon?

10  A.   No, sir.

11  Q.   All right.  He didn't try to slip away in the middle of

12  the night, did he?

13  A.   No, sir.

14  Q.   Through all of your interceptions and surveillance, did

15  you discover his attempting to obtain false information?

16  A.   Attempting to?

17  Q.   Obtain false like ID or anything like that?

18  A.   No, sir.

19  Q.   All right.  And at any rate, you let him go on the 17th,

20  and he went on his way?

21  A.   Yes, sir.

22  Q.   Now, surveillance was continued; correct?

23  A.   Yes, sir.

24  Q.   Was it visible surveillance or was it covert

25  surveillance?

M. Thomas/Cross-Examination (Steingold)

1  A.   It was visible at that point, sir.

2  Q.   During the entire vacation, the FBI made sure that Mr.

3  Assi knew that he was being watched?

4  A.   I'm not sure if he was aware the entire time, but he was

5  aware that they were -- their presence.

6  Q.   At any point did he attempt to flee?

7  A.   No, sir.

8  Q.   Now, after the 17th -- in fact it was on the 17th, the

9  same day that Mr. Assi talked to the agents in Gatlinburg,

10  there was a series of raids in the Detroit area; correct?

11  A.   Search warrants, sir.

12  Q.   Okay.  There was a search of Mr. Assi's residence?

13  A.   That's correct, sir.

14  Q.   Of his work place?

15  A.   Correct, sir.

16  Q.   Of his father's house?

17  A.   Correct, sir.

18  Q.   Of two of his sisters' houses?

19  A.   His brother's house and I believe his sister's house,

20  yes, sir.

21  Q.   All right.

22       THE COURT:  They all live here?

23  BY MR. STEINGOLD:

24  Q.   Do they all live in the Detroit area?

25  A.   Yes, ma'am, your Honor.

M. Thomas/Cross-Examination (Steingold)

1   Q.   And from whatever information you gathered through these

2   searches, you still did not feel you had enough evidence to

3   arrest Mr. Assi; is that correct?

4           THE COURT:  I think he's already testified that he

5   --

6           MR. STEINGOLD:  It wasn't his call.

7           THE COURT:  -- that wasn't the reason that he was

8   not arrested.

9           MR. STEINGOLD:  All right.

10  BY MR. STEINGOLD:

11  Q.   At any rate, in all of these items that were found, and

12  all these articles that were found, did you find any weapons?

13  A.   There was one shotgun at his residence, sir.

14  Q.   All right.  Did you determine whether or not that was for

15  personal use or protection; did you learn anything about that?

16  A.   No, sir, it wasn't relevant.

17  Q.   Now, any of these items that he was either found in

18  possession in or you claim he said he'd already shipped, are

19  any of them munitions?

20  A.   No, sir.

21  Q.   All right.  And are any of these articles that you found,

22  did any of them have anything to do with killing?

23  A.   No, sir.

24  Q.   Everything was surveillance related; is that right?

25  A.   Correct, sir.

70

M. Thomas/Cross-Examination (Steingold)

1  Q.   All right.  Now, on the 21st he was again requested to

2  meet with the agents, including you; correct?

3  A.   Correct.

4  Q.   He was not picked up and taken anywhere; you called or

5  someone called and he agreed to meet the agents; correct?

6  A.   Yes.  An appointment was set up.

7  Q.   All right.  And he came in over at the Hyatt Regency in

8  Dearborn; correct?

9  A.   Correct.

10  Q.   And he provided you more information about the identity

11  and description of the persons in Lebanon who you believe, or

12  you claim he told you, were his Hizballah connections;

13  correct?

14  A.   That he did not previously -- yes, sir.

15  Q.   Right.  And he gave you more information about his

16  intention to take these items to Lebanon, knowing they were

17  going to end up at Hizballah; correct?

18  A.   Correct, sir.

19  Q.   And he even offered to take a polygraph to confirm that

20  he's been telling you guys the truth; correct?

21  A.   That's correct, sir.

22  Q.   And after all of that was done, you let him go?

23  A.   Correct, sir.

24  Q.   To return home to his wife and kids?

25  A.   Correct.

71

M. Thomas/Cross-Examination (Steingold)

1  Q.    And finally you effectuated, or the marshals on behalf of

2  the FBI effectuated an arrest of my client yesterday?

3  A.    Sir, it was the FBI.

4  Q.    All right.  At any point prior to his arrest, did he

5  attempt to flee?

6  A.    No, sir.

7  Q.    Do you have any information that prior to his arrest he

8  attempted to obtain false identification?

9  A.    No, sir.

10  Q.   Have you any information to suggest to the Court that he

11  has made plans to obtain false identification?

12  A.   No, sir.

13  Q.   Have you any information to suggest to the Court that

14  some organization, whether Hizballah or otherwise, has made

15  arrangements or has laid the groundwork for secreting my

16  client out of the country?

17  A.   No, sir.

18  Q.   Have you obtained any information to suggest that -- to

19  show that my client was planning on moving himself and/or his

20  family to -- to Lebanon sooner than 15 years when he retires?

21  A.    Sir, there was quite a few bags of clothing packed and

22  ready to go in the residence when we conducted the search

23  warrant.

24         THE DEFENDANT:  It's for storage.  It's just winter

25  clothing.

M. Thomas/Cross-Examination (Steingold)

1  BY MR. STEINGOLD:

2  Q.    You found -- where did you find these items?

3  A.    In the upstairs, sir.

4  Q.    Where upstairs?  I mean in a bedroom, or in a storage

5  area?

6  A.    No, sir.  It appeared to be a storage area.

7  Q.    All right.  Did you determine whether any of the

8  children's or the wife's clothes were still in their drawers,

9  or had been packed in these things that you found in the

10  storage area?

11  A.    No, sir.

12  Q.    Had you any information that my client's wife and kids

13  had arrangements to go to Lebanon or anywhere outside the

14  United States?

15  A.    No, sir.

16  Q.    Have you any information that my client rented a place in

17  or obtained a residence somewhere in Lebanon?

18  A.    No, sir.

19         MR. STEINGOLD:  I have nothing further at this time,

20  your Honor.

21         MR. HELLAND:  Just a couple of quick questions, your

22  Honor.

23                    **REDIRECT EXAMINATION**

24  BY MR. HELLAND:

25  Q.    Agent Thomas, the last series of questions that Mr.

73

M. Thomas/Redirect Examination (Helland)

1  Steingold asked you had to do with information in your

2  possession regarding Mr. Assi's plans to leave this country

3  for Lebanon sooner than 15 years from now.  Sir, I'd like to

4  direct your attention to -- I'm sorry, what's the phrase for

5  the evidence you picked up through the wire tap?

6  A.   Tech cuts.

7           THE COURT:  Tech cuts.

8  BY MR. HELLAND:

9  Q.   Tech cuts.  I'd like to refer you to tech cuts of which

10  you're aware.  In those tech cuts, did Mr. Assi discuss plans

11  to leave the United States?

12  A.   Yes.

13  Q.   And in particular -- and what was it that Mr. Assi

14  requested that his friend in Lebanon do for him?

15  A.   To find him an apartment or some type of housing.

16  Q.   And in those tech cuts, did Mr. Assi make reference to

17  his children in school?

18  A.   I believe, yes, sir.

19  Q.   And what was that reference again?

20  A.   That he was going to, if it had to be, pull them out

21  early.

22  Q.   And did Mr. Assi -- is there anything -- to your

23  knowledge, is there anything in the tech cuts that indicates

24  that he intended to pull them out of school in 15 years?

25  A.   No, sir.

M. Thomas/Recross-Examination (Steingold)

1   Q.   Okay.

2           MR. HELLAND:  No further questions, your Honor.

3                       **RECROSS-EXAMINATION**

4   BY MR. STEINGOLD:

5   Q.   You read these tech cuts?

6   A.   No, sir.

7   Q.   Somebody told you that these were on the tech cuts?

8   A.   Yes, sir.

9   Q.   Did you ever ask to see a copy of the transcript?

10  A.   No, sir.  I just recently learned of this, sir.

11  Q.   How recently?

12  A.   I would say within the last three hours, sir.

13  Q.   Who told you that?

14  A.   Supervisory Special Agent Cummings at FBI Headquarters.

15  Q.   And did he indicate who it was that my client contacted

16  in Lebanon to find a residence?

17  A.   No, sir.

18  Q.   Did he indicate for how long that place was to be

19  obtained?

20  A.   No, sir.

21  Q.   Would it be important to know if he was looking for a

22  place for a couple of months for an extended vacation or a

23  permanent residence; would that be important to find out?

24  A.   I would say yes, sir.

25  Q.   All right.  You didn't find that out, did you?

M. Thomas/Recross-Examination (Steingold)

1    A.    Sir, I just told you, I recently found out in the last --

2    within the last two or three hours.

3              MR. STEINGOLD:  Nothing further.

4              MR. HELLAND:  Nothing further, your Honor, and no

5    further witnesses.

6              THE COURT:  All right.  You may step down.  Thank

7    you for your testimony.

8              THE WITNESS:  Thank you, your Honor.

9         (Witness excused.)

10             THE COURT:  Mr. Steingold, do you have any other

11   witnesses, evidence or anything like that?  If you do, or if

12   you would like a moment to speak about it with your client, we

13   could take this other matter here, which -- on which I think

14   people are waiting, and --

15             MR. STEINGOLD:  I'd be glad to wait, your Honor, but

16   --

17             THE COURT:  Two brief matters, and then -- and then

18   we'll -- so we'll take a recess in this proceeding.  You can

19   have an opportunity to speak with your client and decide what

20   you want to do with respect to evidence or whatever.  We'll go

21   off the record on this matter and call these other two cases.

22        (Unrelated proceedings held.)

23             THE CLERK:  The Court again calls the case of Fawzi

24   Assi, 98-80695.

25             THE COURT:  Mr. Steingold, have you had an

1  opportunity to speak with your client and in regard to what

2  we're doing next?

3       MR. STEINGOLD:  Yes, your Honor.  I would like to

4  call my client to the stand.

5       THE COURT:  Okay.  You know that I would be willing

6  to accept his testimony by proffer, and that he has a Fifth

7  Amendment right not to testify?

8       MR. STEINGOLD:  Your Honor, the only thing that I

9  was going to bring out from him is his background and his

10  intention not to flee.  If the Court would allow that to be

11  done by proffer, I will do that.

12       THE COURT:  That's fine.  Why don't you have a seat.

13       MR. STEINGOLD:  Your Honor, my client --

14       THE COURT:  Would you like to hear Mr. Sims' report

15  first?

16       MR. STEINGOLD:  Sure.

17       THE COURT:  Because we haven't heard that because it

18  wasn't ready.

19       MR. STEINGOLD:  Okay.

20       THE COURT:  I mean I don't --

21       MR. STEINGOLD:  No, that would -- I would appreciate

22  that, your Honor.

23       THE COURT:  Okay.

24       MR. STEINGOLD:  I should have thought of that.

25       MR. SIMS:  Craig Sims on behalf of the Pretrial

1    Services.

2              I interviewed the Defendant, and he advises that he

3    is a resident of Middlepoint Street in Dearborn, Michigan.  He

4    resides there with his -- with his ex-wife, who he

5    acknowledges that he was previously divorced from.  The

6    divorce was finalized, he believes, in April of 1998.  He and

7    his wife have since reconciled.  They live at that location

8    with their three children.

9              They've been at that location for 18 months, on the

10   same street for five years.  He's been in the United States in

11   Dearborn, Michigan, since 1979.  He advises that he is a U.S.

12   citizen, and that he possesses a U.S. passport.

13             He is employed by Ford Motor Company.  He's been

14   employed for seven years.  Prior to this employment, directly

15   before, he was under a contractual relationship with them for

16   four years.  And before that he was employed by General

17   Motors.  He is -- he is a -- he holds a masters degree in

18   mechanical engineering, which he obtained from Wayne State in

19   1986.  So he's a long-time resident of this community.

20             He has family ties that consist of two brothers and

21   five sisters, all in the Dearborn, Dearborn Heights area.  His

22   parents, both mother and father, live in Lebanon.  He advises

23   that he has no --

24        (Discussion off the record.)

25             THE COURT:  No, that's wrong?

78

1          MR. STEINGOLD:  His mother and father are here.  And

2     in fact, your Honor, his father is in the courtroom.

3          THE DEFENDANT:  My grandparents, but not --

4          MR. STEINGOLD:  He meant his grandparents are in

5     Lebanon.

6          THE COURT:  Oh, grandparents.  His father is in the

7     courtroom?

8          MR. STEINGOLD:  Yes.

9          THE COURT:  And you are?

10         MR. STEINGOLD:  That's -- the father is the

11    gentleman in the white shirt with the grey stripe, and the

12    young man next to him is my client's older brother.

13         THE COURT:  Okay.

14         MR. SIMS:  (indiscernible - not at a microphone.)

15         THE COURT:  Okay.

16         MR. SIMS:  Then it has -- he advises that he lives

17    at that address with his wife, and that he is renting; he does

18    not own the home.

19         THE DEFENDANT:  Yes, it's my father's.

20         THE COURT:  Well, the father owns the home.

21         MR. SIMS:  The father owns the home.  So he owns no

22    specific property.

23         Prior criminal record, only in the form of a

24    misdemeanor; domestic assault conviction in Dearborn court in

25    January of 1998, which he advised it was a domestic dispute

1  between him and his wife.

2      Pretrial Services would recommend that the Defendant

3  be released on bond with conditions that may include

4  electronic monitoring and travel restrictions (indiscernible).

5      MR. STEINGOLD:  Your Honor, the only thing that I

6  would add to the report is that my client does have three

7  children, aged 10, 11 and 13, living at the home with himself

8  and his wife.

9      And as a further proffer, your Honor, my client's

10  father and two brothers are in court, as well as a brother-in-

11  law, and in particular Sami Assi, one brother -- would you

12  please stand -- is also a United States citizen, a veteran of

13  the U.S. Army, is prepared to assume third-party custody

14  should that be a condition that the Court might want to

15  consider, and if the Court would like to question him about

16  his residence and his ability to serve as third-party

17  custodian, I would just offer that he is available for that.

18      THE COURT:  This is the same guy who allegedly

19  received the $60,000 in cashier's checks from the Hassan

20  person?

21      MR. STEINGOLD:  This is the person who the

22  Government claims took back an envelope that had contained

23  that.  There is no allegation that he knew what was in the

24  envelope.  In fact it's suggested in the reports that he --

25  that apparently no one was supposed to know.  And yes, he is

1   the same person who is alleged to have carried that envelope.

2          As any number of family members, your Honor, that

3   would be willing to serve as third-party custodians.  All five

4   of his sisters, his two brothers, or his parents, and any

5   combination of them.

6          MR. HELLAND:  Your Honor, before we start talking

7   any further about third-party custodians, I would like to

8   finish the question of detention, if we might.

9          MR. STEINGOLD:  Oh, I'm just offering that --

10          THE COURT:  That was his proffer.

11          MR. HELLAND:  Okay.

12          THE COURT:  His proffer -- his proffer is for me to

13   consider this part plus appropriate third-party custodians

14   would be available.  Do you have any questions of potential

15   third-party custodians?

16          MR. HELLAND:  No, your Honor.

17          THE COURT:  Okay.  I'll give --

18          MR. STEINGOLD:  I have nothing else to offer, your

19   Honor.

20          THE COURT:  Okay.  Argument on the issue of

21   detention.

22          MR. HELLAND:  Thank you, your Honor.  I will be

23   brief.

24          For a number of reasons, your Honor, we feel quite

25   strongly that there is no condition or combination of

81

1  conditions that will guarantee that Mr. Assi will be present

2  for trial.  First I want to start with the offense.

3          The guidelines for this offense exceed 17 years in

4  custody, your Honor.  Whatever might be his inclination to

5  stick around if his exposure were relatively brief, I think a

6  sentence of that magnitude would give any rational person

7  pause, particularly a person in Mr. Assi's situation, where

8  he's a citizen of Lebanon --

9          THE COURT:  Uh-uh.  Uh-uh.  No.

10          MR. HELLAND:  Yes.  I'm sorry, if I failed to cover

11  that, let me proffer.  He is -- he has dual citizenship, your

12  Honor.  So if I failed to cover that, let me do that right

13  now; okay?

14          Agent Thomas?

15          AGENT THOMAS:  Dual citizenship.

16          MR. HELLAND:  And how do you know that?

17          AGENT THOMAS:  He has -- is in possession of two

18  passports, Lebanese and American.

19          MR. STEINGOLD:  Anyone who has ever been a citizen

20  of Lebanon retains that citizenship, even if they're made a

21  citizen of another country, unless specifically denounced.

22          THE COURT:  No, no, no.  If he is a naturalized

23  citizen of the United States --

24          MR. STEINGOLD:  Which he is.

25          THE COURT:  -- he had to give up his Lebanese

82

1   citizenship in order to become a naturalized citizen.

2          MR. HELLAND:  But he retains a Lebanese --

3          THE COURT:  Because we do not permit dual

4   sovereignty -- I mean dual citizenship.

5          MR. HELLAND:  But he retains a Lebanese passport; is

6   that correct?

7          THE COURT:  I absolutely renounce and abjure all

8   allegiance and fidelity to any foreign prince, potentate, et

9   cetera, et cetera, et cetera.

10          MR. HELLAND:  And with all due respect, that part of

11   the oath we already know is in question because of the support

12   he was providing to the organization.  He does retain a

13   Lebanese passport.  So whatever he might have said under oath,

14   the fact is that under the laws of Lebanon he's a Lebanese

15   citizen, and he's got a Lebanese passport.

16          THE COURT:  Okay.  I don't know about that, but I

17   know that -- I don't think we permit.

18          MR. HELLAND:  We may not, but we also don't permit

19   the export in question here.

20          THE COURT:  Okay.

21          MR. HELLAND:  In any event, we have no extradition

22   treaty with Lebanon, so were he to go to Lebanon, we would

23   have no ability to bring him back here.

24          He has indicated at some point, whether it's

25   immediately, as he said in the tech -- or in the near future

1  as he indicated in the tech cuts, or ultimately, that he does

2  intend to relocate to Lebanon.  Again, a rational person in

3  his situation, facing the exposure that he's facing, would not

4  stick around in this country for the purpose of serving a

5  lengthy prison term, and then retire to Lebanon.

6          The evidence against him, I submit, is extremely

7  strong, so his chances of being convicted are very high.

8          No doubt -- and Mr. Steingold has intimated in

9  various ways that Mr. Assi was cooperative.  I think it bears

10  noting that what Mr. Assi has done -- first of all, he hasn't

11  fled, although he's been under 24-hour surveillance; it would

12  have been difficult.  He was cooperative before such time that

13  he was aware that he was in any substantial difficulty, and

14  after that he was aware he was under surveillance.

15          But he has -- every time he has been interviewed, he

16  has lied about material parts of his activities until

17  confronted with something that forced him to tell the truth.

18  So to characterize what he has done as cooperative I think is

19  to misstate it.  He has put on a facade of cooperation, which

20  ultimately, I think, has redounded to his detriment, but I

21  don't think it can be characterized as cooperation.

22          He attempted to destroy the evidence, at least

23  somewhat what he considered to be relevant evidence against

24  him.

25          And I think it cannot be overstated that he was

1   acting on behalf of a well-funded international organization,

2   which makes him completely different than the customary

3   criminal who might have ties to another country.  He was

4   acting in essence as the agent of a foreign government, or

5   what passes as a quasi-government in Lebanon.  And, your

6   Honor, that agency has the power and the means to relocate him

7   and to provide well for him in Lebanon should he choose to go

8   there.

9          And under the circumstances, your Honor, it's our

10   strong feeling that nothing will guarantee his presence here.

11          MR. STEINGOLD:  If I just heard correctly, Mr.

12   Helland just made Hizballah a quasi-government.  I'm not aware

13   of the basis for that, nor am I aware of any indication of a

14   link between the Hizballah and the Lebanese government.

15          As far as the passport's concerned, I've been

16   advised by another naturalized citizen in this courtroom that

17   when you become a naturalized citizen, you do renounce your

18   citizenship, but you don't give up your passport, and that

19   person is Mr. Villarruel, who was born in Mexico and is a

20   naturalized citizen, but still retains his Mexican passport.

21   That doesn't mean that he's a traitor to the United States or

22   that he has it for some surreptitious reason.  There's nothing

23   illegal or improper about it.

24          In terms of the allegations against my client, your

25   Honor, what we are here basically to determine is not the

1    guilt or innocence of my client, although I would point out,

2    number one, there is no presumption.  Number two, while this

3    is a ten-year offense, I don't know what the guidelines are.

4    And while I'm not in a position to contest Mr. Helland's

5    suggestion of what they are, that is not before the Court.

6    There is no minimum sentence.  This is a probationable

7    offense, in theory.  That we know for sure.

8           MR. HELLAND:  My representation was the guidelines

9    are 17 years, exceed 17 years.

10          MR. STEINGOLD:  Well, with the statute, at least the

11   one I'm aware of, being a ten-year statute, I'm not sure how

12   the guidelines could be 17 years.

13          MR. HELLAND:  There are multiple counts.

14          MR. STEINGOLD:  If they're going to want consecutive

15   sentencing if he's convicted on everything, I guess we can add

16   them all up.  But all three offenses, as I understand it,

17   carry a maximum of ten years and carry no mandatory minimum.

18          Am I correct about that?

19          MR. HELLAND:  That's correct.

20          MR. STEINGOLD:  Your Honor, let's talk about my

21   client's danger -- being a danger to the community.  There has

22   been not one bit of evidence suggested by the Government to

23   show that he's a danger to this community.  There is nothing

24   that suggests that what he is alleged to have done was

25   designed to inflict any -- any danger at all on any citizen of

86

1    the United States, let alone the community of Dearborn or the

2    greater Detroit area.   There's no suggestion that any of the

3    items he's alleged to have procured were weapons or could be

4    used in any aggressive manner.   There is no suggestion that

5    because of his background he poses a risk to the community.

6         To the contrary, he has conducted himself as law-

7    abiding citizen his whole life, and he has been cooperative.

8    While the Government may contest whether he told them

9    everything all at once or just all came out, what we do have

10   demonstrated is that he has told them everything, including

11   identifying the persons who they claim are Hizballah members.

12   If there is a danger at all, the danger is to my client and

13   his family should they go to Lebanon if the people allegedly

14   in the Hizballah know that he has identified them to the

15   Government as being Hizballah agents.   That's the danger, not

16   to the community, but to my client if he goes to Lebanon,

17   which goes to his risk of flight.   Why would he go to Lebanon

18   if he's already told the Government who these people are, what

19   their intentions are, and what they look like?

20        And as far as his intention to flee, or the

21   likelihood that he would flee, I give you the fact that he's

22   been here for 20 years.   That his whole family is here, not

23   just his wife and his three children, but his mother, his

24   father, all of his siblings and their family, as well as his

25   wife's family.   They're all here in the Detroit area.

1          And the best indication of his not having an

2     intention to flee has been his conduct since he was originally

3     stopped at the airport on July 13th.  While we are told -- and

4     I'm not going to contest it -- he was under 24-hour

5     surveillance, that actually supports our position, because my

6     client did not know, or at least there's no suggestion that he

7     knew that he was under 24-hour surveillance.  Yet, he made no

8     preparations to flee.  He was not trying to obtain false

9     identification.  There was no call intercepted in these last

10    two weeks -- and they were listening to everything -- where he

11    suggested he was going to take his family and get the heck out

12    of here.  There's nothing like that at all.

13         And if he is willing -- and he is willing to

14    surrender his passport and subject himself to electronic

15    tethering and/or third-party custody, regular reporting, any

16    combination of the factors listed in the statute, the Court

17    can very well be assured that he's not going anywhere.

18         And in addition to the electronic tethering, I think

19    it's safe to assume that if the Court did release him on bond,

20    that 24-hour surveillance is going to continue.  He's not

21    going anywhere, your Honor.

22         I would request that the Court follow the

23    recommendation of Pretrial Services and allow my client a

24    bond.

25         MR. HELLAND:  Real briefly.  To the -- to the extent

1  there's any suggestion that the FBI ought to continue 24-hour

2  surveillance in an effort to keep this guy around, I think

3  that's an unreasonable drain on the taxpayers' resources.

4          THE COURT:  So do I.

5          MR. HELLAND:  And to the extent we talked about

6  danger --

7          THE COURT:  I don't think that's what he meant, but

8  I -- I -- I think that it would be inappropriate to say he

9  should be released because the FBI could conduct 24-hour

10  surveillance.  If that were the case, everybody should be

11  released.

12          MR. HELLAND:  Precisely.

13          THE COURT:  Because the FBI's resources are

14  unlimited; right?

15          MR. HELLAND:  And to the extent we talked about

16  danger to the community, Mr. Steingold has focused on the

17  danger to the Dearborn community or the United States

18  community.  We don't quarrel with that, but I don't think the

19  statute is so narrowly drafted, either.  The danger here is to

20  the community in Lebanon or in southern Lebanon or in Israel

21  that might be impacted by Mr. Assi's actions.

22          THE COURT:  I appreciate that.  On the other hand,

23  this is merely a complaint.  Mr. Steingold has made, I think,

24  pretty compelling arguments about the fact that the Defendant,

25  like or not, has cooperated, has identified all of the players

1   that he has been linked to on the telephone or whatever.  And

2   has placed himself in some position of jeopardy with respect

3   to returning to Lebanon, and at least it would seem has

4   neutralized his value to Hizballah as somebody who is likely

5   to export anything because his activities are known, he's

6   identified those involved, and he's of no use to the

7   organization.  I mean even if he shouldn't be in jeopardy,

8   he's clearly of no use.

9          So if he were to be released on a tether under

10  conditions of close supervision as directed by Pretrial

11  Services, would not -- and surrender his passports, would not

12  we be able to assure the safety of the community and the

13  communities in general, and minimize the risk of flight?

14         MR. HELLAND:  Are you asking or no?

15         THE COURT:  I mean it's somewhat rhetorical, but

16  where would that -- how would that fail to accommodate the

17  needs of the Bail Reform Act setting the least restrictive

18  conditions as possible?  It's not a presumption case.  They're

19  not weapons.  He's got no more value.

20         His family ties are here.  He's been here for 20

21  years.  All of his family, in-laws, whatever, his children are

22  here.  His family has financial ties to the United States.

23         He made no effort, he was -- he didn't know he was

24  under surveillance, didn't know his phone was tapped, at least

25  for some period of time.

90

1    MR. HELLAND:  Two days, yes.

2    THE COURT:  And he made no effort to leave the

3 country, never -- never requested false documents or anything

4 like that, that would lead me to believe that he's not going

5 to flee -- I mean that he is going to flee.

6    MR. HELLAND:  Of course with respect to danger to

7 the community, I agree.  To the extent that he's neutralized

8 as a buying agent, he is not a future danger to this community

9 or another community.  So I agree with that.

10    With respect to his staying, however, I do not

11 agree.  First, with respect to his knowledge that -- or his

12 attempt or any effort to flee, I don't think he was aware

13 until he was arrested or shortly before he was arrested of the

14 magnitude of the situation that he was in.  So the fact that

15 he made no effort to flee I think carries little weight during

16 that window of time.

17    And with respect to his other intent to stay, I

18 submit, your Honor, that if you were given the choice between

19 going to a country where you have substantial ties -- not your

20 immediate family -- I agree those are here; maybe not

21 permanently, but for now they're here.  But if you were given

22 the choice between --

23    THE COURT:  Well, let's not put myself in this

24 situation.

25    MR. HELLAND:  Okay.

1     THE COURT:  I might leave my family.

2     MR. HELLAND:  And I think many a rational person --

3     THE COURT:  His aren't full teenagers yet.  He has

4 another five or six years.

5     MR. HELLAND:  Many a rational person in the same

6 situation, in fact I think most rational people who have plans

7 to return to that country anyhow, and whose stay here is going

8 to be a stay in prison, would not choose staying.

9     THE COURT:  Well, he has other choices.

10     MR. HELLAND:  Not -- I'm not aware that he does have

11 other choices, your Honor.  I mean to go to any other country,

12 yes, but I'm not aware that he has other choices here between

13 a substantial prison sentence here and leaving.

14     THE COURT:  Well, we're only here on a complaint.

15     MR. HELLAND:  I understand.

16     THE COURT:  We don't have an indictment.  We have

17 some -- he's represented by counsel.  I don't know if he's

18 going to be indicted on all three charges or indicted at all.

19     MR. HELLAND:  I can make a representation if that

20 makes any difference to the Court.

21     THE COURT:  Can I see counsel at the bench, and

22 Pretrial.

23     (Conference at the bench off the record.)

24     THE COURT:  Okay.  I've discussed this matter with

25 counsel at the bench.  And after considering all of the

92

1    alternatives, and the testimony, and the factual information,

2    and the recommendation of Pretrial Services, I believe that

3    there are conditions consistent with Pretrial's recommendation

4    under which the Defendant could be released.  Although it's no

5    incumbent upon the magistrate judge to put reasons for release

6    on the record, I am going to do this because I have been

7    advised that the Government intends to appeal this order of

8    release.

9            First of all, this is a case where the Government

10    does not have the benefit of the presumption of detention.

11            Secondly, looking at the factors under 3142(g), and

12    keeping in mind the directive of the statute that the least

13    restrictive conditions are to be imposed, the factors under

14    3142(g) are as follows:

15            "The nature and circumstances of the offense

16        charged, including whether the offense is a crime of

17        violence or involves a narcotic drug."

18            This offense is neither a crime of violence nor does

19    it involve a narcotic drug.  It is an offense that -- that

20    does involve allegations of support for an international

21    terrorist organization.  However, the items that were alleged

22    in the offense do not involve weapons or indications of a

23    crime of violence.

24            I recognize that use of the -- of the -- linking

25    this Defendant with the organization of Hizballah is something

1   that gives anyone pause.  And as I reflected on the testimony,

2   my first response was to detain the Defendant, merely because

3   he was linked with Hizballah.  But I don't think that that is

4   really enough.

5         The weight of the evidence shows that he is not

6   intimately connected with Hizballah, and that the attempt to

7   ship these items were not items directed -- were not

8   munitions, ammunition, guns, any of those other substances.

9   As a matter of fact, one of the items was essentially the same

10   as the FBI was using in the North Carolina surveillance for a

11   fugitive.  I can't make a leap of faith and say that just

12   because the FBI is using a camera like that, they're going to

13   be violent, nor should I make that same leap of faith to say

14   if the Defendant or the persons who -- other people who use

15   this kind of camera are going to necessarily be violent,

16   although I recognize that this organization is on the

17   Secretary of State's list, and this is a very bad factor

18   against the Defendant.

19         But looking at the Defendant himself, as I think I'm

20   bound to do, under 3142(g), item (3), the history and

21   characteristics of him, he has no prior record except for the

22   misdemeanor domestic assault in January with the same person

23   that he's been married to for a long time; then they were

24   divorced; now they're back together; took a family vacation;

25   continue to reside together in the same household; and it

1    appears to be an isolated incident.  Even with that

2    circumstance, there's no evidence of flight, failure to

3    appear, or anything else related to that.

4           His family ties to this community are extremely

5    strong.  His parents are here, his brothers are here, his wife

6    is here, his wife's parents are here, his children were born

7    here.  The family as a whole has financial ties to the

8    community, and the Defendant rents from his father.

9           His employment is also another positive factor in

10   his favor.  He has had -- been here -- he's been employed with

11   Ford seven years now, four years before, previously with --

12   with GM, eleven years in total with Ford.  No evidence that it

13   was anything except solid.

14          His financial resources are -- are strong with

15   respect to continued income, but not so much as to say that he

16   has the wherewithal on his own to leave and go someplace else

17   and start over again.  He's still a salaried employee at Ford.

18          He owns no property in -- in another country, and

19   hasn't made multiple trips to other countries, other than

20   perhaps Lebanon.

21          The cooperation that he has given, with respect to

22   going back to the evidence against him, indicates to me that

23   he has identified all of the persons involved, identified his

24   own involvement in this case, identified other involvement

25   that he has had, and so I think that whether or not he could

95

1  return to Lebanon is clearly an open question.   It's certainly
2  not a favor -- an automatic factor in favor of the Government.
3  It is undeterminable and shouldn't be used as a reason to deny
4  him bail.

5          His length of residence in the community is long
6  time, as is his community ties.   He's been here since 1979, so
7  he has been here approximately 20 years.   He has no evidence
8  of past bad conduct, outside of this -- these allegations, and
9  the misdemeanor assault charge, which seems to be resolved.

10          He has no history relating to drug or alcohol abuse.
11  His criminal history is minimal.   The record concerning
12  appearance at court proceedings is -- shows no failure to
13  appear.

14          He was not currently on probation or parole or
15  release pending trial.

16          The nature and seriousness and the danger to any
17  person or the community that would be posited by the
18  Defendant's release is minimal.   Whatever value he had to
19  Hizballah is now neutralized because of his arrest on these
20  charges and cooperation with the FBI, even though I think the
21  Government would hesitate to characterize this as true
22  cooperation.   But the information that he's provided makes --
23  makes him no longer, it seems to me, of value to this
24  organization.   And he doesn't seem to be, based on what I can
25  see, in a high enough level within the organization that these

1   circumstances would be automatically forgiven.

2          Therefore, I believe that it is appropriate to

3   release him on conditions, and I would restrict his travel to

4   the state of Michigan -- I'm sorry, to the Eastern District of

5   Michigan.  I would require his father to sign an AO form -- I

6   believe it's 44 -- the agreement to forfeit property, to

7   forfeit his home if the Defendant should flee.

8          To be electronically monitored by Pretrial Services,

9   to surrender all passports to Pretrial Services forthwith

10   before his release.  Those could be obtained by a family

11   member and brought down to Pretrial.  To comply with a curfew

12   as directed by Pretrial Services, allowing to maintain --

13   allowing him to maintain his employment.  And to reside at the

14   address on the bond.

15          The Government has asked that I stay this order.  I

16   will do so.  I'm reluctant to stay it over the weekend, but I

17   assume the miscellaneous judge is available, and if they

18   continue to stay after five o'clock, that's fine with me.  If

19   the miscellaneous judge is not available, someone should

20   advise me forthwith.

21          THE CLERK:  The amount of the bond?

22          THE COURT:  The bond would be $100,000 unsecured.

23   It would be an unsecured bond, but the agreement to forfeit

24   property would come into play if the Defendant should flee.

25          All right, is there anything else to be put on the

97

1   record for this?

2           MR. HELLAND:  No, your Honor

3           THE COURT:  Okay.

4           MR. HELLAND:  Not for the United States.

5           THE COURT:  Thank you.

6           MR. STEINGOLD:  Nothing, your Honor.

7       (Discussion off the record.)

8           THE COURT:  Preliminary exam August 3rd.

9       (Discussion off the record.)

10      (Father sworn as to ownership of property.)

11      (Hearing concluded.)

— — —

I certify that the foregoing is a correct transcript of the
proceedings held in the above-entitled matter.

DATED:   August 3, 1998          _Lynn L. Spietz_
                                 Lynn L. Spietz, Transcriber