**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                Case No. 98-80695
                                Hon. Gerald E. Rosen

FAWZI MUSTAPHA ASSI,

    Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S
SECOND AMENDED MOTION TO SUPPRESS STATEMENTS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    September 11, 2007

PRESENT: Honorable Gerald E. Rosen
                 United States District Judge

## I. INTRODUCTION

Defendant Fawzi Mustapha Assi is charged in a four-count indictment with (i) providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1); (ii) attempted unlawful export of defense articles — specifically, night vision goggles — without first obtaining the necessary license or written approval, in violation of 22 U.S.C. § 2778; (iii) attempted unlawful export of a controlled article — specifically, a thermal imaging camera — without the proper license or authorization, in violation of 50 U.S.C. § 1705; and (iv) failure to appear at a July 28, 1998 detention hearing in this case, in violation of 18 U.S.C. § 3146(a)(1). In the days

leading up to the initial indictment in this case, Defendant was interviewed by federal law enforcement officials on two separate occasions, first on July 17, 1998 in Gatlinburg, Tennessee, and then four days later in Dearborn, Michigan.

Through the present motion, filed on November 15, 2006, Defendant seeks to suppress the statements he made during these interviews. In support of this motion, Defendant contends that his statements were the product of a coercive atmosphere, and hence were not voluntarily given. The Government filed a response in opposition to this motion on November 29, 2006, denying that any coercive measures were employed, but conceding that an evidentiary hearing was necessary in light of Defendant's allegations and supporting affidavit to the contrary.

An evidentiary hearing was begun on this motion on May 14, 2007, and was continued on June 5, 2007. In the course of this hearing, the Court heard the testimony of FBI Special Agents Marcia Balicki and Joseph Testani, and Defendant also submitted for the Court's consideration a portion of the testimony given by FBI Special Agent Michael Thomas at a July 27, 1998 bond review hearing. Defendant, however, elected not to testify in accordance with the advice of his counsel.[1] Having reviewed and considered the parties' written submissions and accompanying exhibits, including Defendant's affidavit, and having considered the testimony of the witnesses and the arguments of counsel at the May 14 and June 5, 2007 hearings, the Court now is prepared to rule on

---

[1] Defendant informed the Court of this decision at the June 5, 2007 hearing, and then confirmed this decision at a subsequent hearing held on August 9, 2007.

Defendant's motion. For the reasons stated below, the Court finds that this motion must be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Count One of the indictment in this case charges Defendant Fawzi Mustapha Assi with knowingly attempting to provide material support or resources to Hizballah, an entity that has been designated by the U.S. Secretary of State as a "foreign terrorist organization." This charge stems from an encounter between Defendant and customs agents on July 13, 1998, when Defendant was preparing to board an international flight departing from Detroit Metropolitan Airport. Acting upon information that Defendant was planning to transport technical equipment to members of Hizballah in Lebanon, customs agents approached Defendant at the airport and asked to see his passport. An ensuing search of a bag in Defendant's possession allegedly revealed two Boeing global positioning satellite modules, and the agents also allegedly found night vision goggles and a thermal imaging camera in Defendant's luggage. Defendant was questioned and then permitted to leave.

The present motion concerns Defendant's two meetings with federal law enforcement officials in the immediate aftermath of his July 13, 1998 detention at the Detroit airport.[2] The first of these meetings occurred on July 17, 1998 in Gatlinburg,

---

[2]This is the third motion in which Defendant has sought to suppress the statements he made during these meetings. The first of these motions was filed on January 26, 2005, and was held in abeyance to afford Defendant an opportunity to file a supplemental submission in support of his claim that his statements were the product of coercion. As noted in the Court's February

3

Tennessee, where Defendant had traveled with his wife and children. According to the testimony of FBI Special Agent Marcia Balicki, Defendant had been permitted to leave after his July 13, 1998 encounter with customs agents at the Detroit airport, and had not been placed under arrest, but nonetheless was kept under surveillance as he and his family traveled to Tennessee. Defendant states in his affidavit that he was aware of this surveillance, and that it rendered him unable to sleep "as I was worrying about myself and my family." (Defendant's 11/15/2006 Aff. at ¶¶ 5-6.)

On the morning of July 17, 1998, FBI Special Agents Balicki and Joseph Testani arrived in Tennessee and proceeded to the Gatlinburg hotel where Defendant was staying with his family. According to the testimony of Special Agents Balicki and Testani, the purpose of this visit was to ascertain whether Defendant had procured items for Hizballah, and to seek Defendant's cooperation in providing information about this organization, which, as noted, had been designated by the State Department as a "foreign terrorist organization." The agents testified that they had no intention of placing Defendant under arrest during or as a result of this meeting; to the contrary, Special Agent Testani sought and was given instructions that "no matter the outcome of our interview, short of [Defendant] admitting to murdering someone, that he would not be arrested," but

---

10, 2006 opinion and order concerning another of Defendant's motions, no such filing was ever forthcoming. See United States v. Assi, 414 F. Supp.2d 707, 710 n.2 (E.D. Mich. 2006). Instead, Defendant filed a second motion to suppress on March 31, 2006, once again unaccompanied by any sort of evidence, or even a proffer, in support of his claim of coercion. After this motion was denied without prejudice at an April 28, 2006 hearing, Defendant filed the present motion on November 15, 2006, this time accompanied by the threshold support — namely, his affidavit — that was lacking from his prior submissions.

that the matter would instead be left to the subsequent review and determination of the Department of Justice. (6/5/2007 Hearing Tr. at 17-18.)[3]

Upon arriving at the hotel, the agents first secured the use of a room directly adjacent to the one in which Defendant was staying, and then knocked on the door of Defendant's room at or around noon. The agents were wearing civilian clothes, and were armed but did not display their weapons. When Defendant answered the door, the agents identified themselves and asked to speak to him concerning information he might be able to provide about Hizballah. Defendant agreed, but asked for an opportunity to change his clothes before accompanying the agents to the adjacent room. The agents waited outside while Defendant changed his clothes, and then walked with him to the next room.

The agents proceeded to interview Defendant over the next two or three hours. At the outset, they informed Defendant that he was free to leave or to stop answering questions at any time, and Special Agent Testani apologized to Defendant "for the surveillance that he was under." (6/5/2007 Hearing Tr. at 27-28.) Defendant, in turn,

---

[3]Defendant seeks to challenge this assertion by citing the testimony of FBI Special Agent Michael Thomas at a July 27, 1998 bond review hearing in this case. In particular, Defendant points to Special Agent Thomas's concessions that Defendant was "the focus of an investigation" at the time of the July 17, 1998 meeting with Special Agents Balicki and Testani, and that this meeting was intended, at least in part, to "develop enough information to effectuate [Defendant's] arrest if [federal law enforcement officials] didn't already have . . . enough information." (7/27/1998 Hearing Tr. at 65.) Special Agent Thomas further agreed that Defendant "was never advised of any rights" during this meeting, although he asserted that this was unnecessary because Defendant "was never in custody." (Id.) Special Agent Thomas also acknowledged, however, that he was not present at the July 17 meeting. (Id.) In addition, the agent testified that Defendant was not, in fact, arrested at the conclusion of the meeting, but that he instead was allowed to continue with his family vacation. (Id. at 67.)

5

indicated that he "was expecting something like this" in light of the surveillance. (Id. at 27.) According to the agents, Defendant was polite and cooperative throughout the interview, did not appear to be angry, tired, or overly anxious, was straightforward in his responses to questions, and evidenced no difficulty in understanding the agents' inquiries. The agents testified that they did not threaten Defendant or discuss any potential criminal charges he might be facing, nor was there any mention of an attorney. Indeed, Special Agent Balicki testified that if Defendant had requested an attorney, her practice would have been to discontinue the interview at that point. In his affidavit, however, Defendant states that he "informed the agents that I wished to have an attorney present, but was denied representation of legal counsel." (Defendant's 11/15/2006 Aff. at ¶ 7.)

At the conclusion of this interview, Defendant asked what would happen next and was told that the agents would be interested in continuing their dialogue with him. Defendant also inquired whether he was free to continue on his trip, and the agents responded that he was, but advised him that the surveillance would continue. According to Special Agent Testani, Defendant indicated that the continued surveillance likely would lead him to cut short his trip, and the agent responded that he "felt bad he was going to cut his vacation short," and that he "didn't think it was necessary for [Defendant] to do that." (6/5/2007 Hearing Tr. at 34.) Special Agent Testani urged Defendant to "forget about" the surveillance and "consider himself the best protected vacationer in Gatlinburg," but Defendant stated that he planned to return home to Detroit. (Id. at 34-35.)

Following Defendant's return to Detroit, Special Agent Balicki arranged for another meeting with him on July 21, 1998 at a hotel in Dearborn, Michigan. Special Agents Balicki and Testani attended this meeting, along with FBI Special Agent Michael Thomas. The agents obtained a room at the hotel, arranged for food and drinks to be brought in, and were present in the room when Defendant arrived. Upon Defendant's entry into the hotel room, the door was closed and remained shut throughout the meeting, which lasted perhaps one and a half or two hours. The agents were armed but did not display their weapons.

According to Special Agents Balicki and Testani, the purpose of this second meeting was to continue to explore the possibility of securing Defendant's cooperation in obtaining information about Hizballah, and to ask follow-up questions on the subjects addressed at the initial meeting. The agents again characterized Defendant as polite, calm, and willing to answer their questions, although Special Agent Balicki testified that little new information was learned during this interview. According to Special Agent Testani, the meeting concluded when Defendant indicated that he no longer wished to talk to the agents and the agents honored this request. (See 6/5/2007 Hearing Tr. at 37, 40.)

Although neither agent could recall Defendant requesting, or even mentioning, an attorney during the course of this second meeting, Special Agent Balicki testified that Defendant "[p]erhaps" might have asked at the conclusion of the interview whether the agents thought that he needed a lawyer. (5/14/2007 Hearing Tr. at 85.) Special Agent

7

Balicki further testified that "my answer [to such a question] always is, if you think you need a lawyer, go and get one." (Id. at 85-86.) In addition, Special Agent Balicki testified that over the course of the two meetings, the agents advised Defendant that they might be able to "help with the . . . pending case" if he agreed to cooperate with them, but that he otherwise would be "on [his] own." (Id. at 72, 117.)

As with the first meeting, the agents left the second meeting without having secured Defendant's agreement to cooperate, but with the belief that further discussions might yet lead to such an arrangement. Following the July 21, 1998 interview, Special Agent Balicki received perhaps two or three telephone calls from Defendant exploring the possibility of another meeting, but Defendant subsequently called and stated that his "lawyer told [him] not to" attend any further meetings. (Id. at 86.) This was the last of Special Agent Balicki's contacts with Defendant, and he was arrested shortly thereafter.

## III. ANALYSIS

Under well-established due process principles, the Government may not introduce at trial the involuntary statements of a defendant made in response to coercive police activity. See Colorado v. Connelly, 479 U.S. 157, 165-67, 107 S. Ct. 515, 521-22 (1986). A statement will be deemed involuntary, and hence inadmissible, if three criteria are satisfied: (i) that the police engaged in "objectively coercive" activity; (ii) that "the coercion in question was sufficient to overbear the defendant's will;" and (iii) that "the alleged police misconduct was the crucial motivating factor in the defendant's decision to

8

offer the statement." United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (citing McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)). Where, as here, a defendant contends that his statement was coerced, the Government "bears the burden of proving by a preponderance of the evidence that the [statement] was in fact voluntary." Mahan, 190 F.3d at 422. "In determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." Mahan, 190 F.3d at 422 (internal quotation marks and citation omitted).

The Court's analysis in this case need not proceed beyond the first step of the three-part inquiry, because the Government has established by a preponderance of the evidence that its agents did not engage in any sort of "objectively coercive" activity in eliciting the statements in question. According to the uniform testimony of Special Agents Balicki and Testani, Defendant voluntarily agreed to meet with them and answer questions on both July 17 and 21, 1998, despite being advised that he was under no obligation to do so. Although the agents were armed during these meetings, they testified that they did not display or brandish their weapons at any time, nor did they otherwise make any show of force that might have contradicted their verbal assurances that Defendant was free to end the interviews at any time. Indeed, the agents' testimony reflects that they kept their word in this regard, as they promptly concluded the second meeting when Defendant indicated that he no longer wished to speak to them.

Moreover, both of the meetings occurred during daylight hours, and neither was

inordinately long. There is no evidence that the agents compelled Defendant's presence at either meeting, whether through the actual or threatened use of force or via any other means. Rather, the record reflects that Defendant walked of his own volition to an adjacent hotel room for the Gatlinburg meeting, and that he arrived on his own at the Dearborn hotel where the second interview occurred. While the hotel room doors were closed on both occasions, and while Defendant was outnumbered by two or three agents, the testimony of Special Agents Balicki and Testani indicates that Defendant did not appear overly intimidated by this environment, but instead spoke freely, calmly, and rationally in response to the agents' inquiries. The Court fully credits this testimony, where the two agents' accounts were entirely consistent on this point, and where the agents' demeanor, straightforward responses, and lack of evasiveness upon direct and cross-examination uniformly support the conclusion that they were credible witnesses.

The only aspect of the agents' testimony that suggests even the slightest hint of coercive activity is their apparent offer of "help" with the charges that Defendant was potentially facing if he agreed to cooperate with them. As the Sixth Circuit has observed, "a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary." United States v. Wrice, 954 F.2d 406, 411 (6th Cir. 1992). Yet, the Sixth Circuit has since clarified that "promises of leniency may be coercive" only if they are "broken or illusory." United States v. Johnson, 351 F.3d 254, 262 (6th Cir. 2003). There is no evidence of any broken or illusory promise here, where the agents, at most, offered only generalized "help" in any case that might subsequently be brought

against Defendant, and did not promise to "make the case go away." (5/14/2007 Hearing Tr. at 81, 117.)[4] The agents, moreover, were never called upon to make good on any such promise, where Defendant neither accepted nor rejected the agents' invitation to cooperate with the federal authorities, but instead ultimately decided, evidently after speaking to an attorney, to forgo any further discussions that might have led to such an arrangement. Finally, it bears emphasis that Defendant himself does not suggest in his affidavit that he was lured into speaking by a promise of leniency, whether false or otherwise, or by any other sort of representation made by any of the agents during the course of the two interviews.

Nor does the Court find any evidence of coercive activity in the testimony of Special Agent Thomas at the July 27, 1998 bond review hearing. In directing the Court's attention to a portion of this testimony, Defendant evidently seeks to raise a question as to the objectives that the federal authorities sought to achieve through their two interviews with Defendant. In particular, Special Agent Thomas testified that the July 17, 1998 meeting with Defendant in Gatlinburg was intended, at least in part, to obtain the information necessary to effectuate his arrest. (See 7/27/1998 Hearing Tr. at 65.) From this testimony, Defendant apparently concludes that the July 17, 1998 meeting was a coercive interrogation, as opposed to a voluntary interview.

---

[4]It is worth noting that, according to the uniform testimony of Special Agents Balicki and Testani, the agents did not go beyond general promises of assistance and allude to any serious consequences faced by Defendant or his family if he elected not to cooperate. (See 5/14/2007 Hearing Tr. at 117; 6/5/2007 Hearing Tr. at 62.)

11

As a threshold matter, the Court gives little or no weight to Special Agent Thomas's testimony on this point, where he did not attend or participate in the July 17, 1998 meeting, and where his testimony is contrary to the account of Special Agent Testani, who not only participated in this interview but did most of the questioning. As noted earlier, Special Agent Testani testified that he sought and obtained explicit instructions from his superiors that "no matter the outcome of [the July 17] interview, short of [Defendant] admitting to murdering someone, that he would not be arrested" at the conclusion of this meeting. (6/5/2007 Hearing Tr. at 17-18.) Special Agent Testani further testified that he "disagreed" with the view expressed by agents in the FBI's Tennessee office that Defendant should be arrested if he acknowledged involvement with a terrorist organization, that his "expectation" in traveling to Gatlinburg to meet with Defendant was that this interview was not "for the purpose[] of gathering evidence to arrest" Defendant, and that he felt "more comfortable" upon confirming with his superiors that this was not the purpose of the meeting. (Id. at 17-18.) Similarly, Special Agent Balicki testified that the purpose of the July 17 meeting was to ascertain Defendant's willingness to cooperate with the federal authorities in their investigation of Hizballah, and she expressly denied that Defendant was arrested, detained, or given the impression that he was under arrest. (5/14/2007 Hearing Tr. at 60-65, 67.)

The Court credits these accounts over the testimony of Special Agent Thomas, where Special Agent Testani made a point of clarifying the objective of the July 17, 1998 meeting with Defendant, and where he actually led this interview and thus was in a

position to pursue this objective.  Moreover, the testimony of Special Agents Testani and Balicki is wholly consistent on this point, with both agents emphasizing that their intent was to secure Defendant's cooperation rather than his arrest.  And, of course, the record bears this out, where Defendant was *not* arrested at the conclusion of the July 17 meeting, but instead was allowed to leave and urged to continue on his family vacation. Indeed, if the July 17 meeting were, in fact, a coercive interrogation, it seems unlikely that Defendant would have elected to meet with the agents again just a few days later.  Yet, he did precisely that.

Special Agent Thomas, in contrast, was not present at the July 17 interview, and did not participate in — or, for all that appears in the record, have any knowledge of — the discussions between Special Agent Testani and his superiors regarding the purpose of the meeting or the possibility of arresting Defendant.  In any event, even accepting the testimony of Special Agent Thomas that the July 17 meeting was intended, at least in part, to gather evidence that could lead to Defendant's arrest, any such underlying "mixed motives," standing alone, would not be enough to render Defendant's statements involuntary, absent evidence that this purported evidence-gathering objective manifested itself in concrete, objectively coercive activity that led Defendant to speak.  There is no evidence in the record of such coercive activity, whether in Special Agent Thomas's testimony or elsewhere.

This leaves only Defendant's assertion in his affidavit that when he met with

Special Agents Balicki and Testani on July 17, 1998, he was "subjected to intimidation and fear which resulted in a coercive atmosphere which overbore my will and resulted in the statements I made." ( Defendant's 11/15/2006 Aff. at ¶ 8.)  Yet, the only examples of objectively coercive activity that Defendant arguably identifies in his affidavit are (i) the surveillance he and his family were under as they traveled from Michigan to Tennessee, and (ii) the federal agents' purported refusal to honor his request to have an attorney present at the July 17 meeting.  As to the former, Defendant has not identified, nor has the Court's research uncovered, any authority for the proposition that surveillance alone qualifies as "objectively coercive" activity.  Indeed, surveillance seemingly does no more than make an individual aware that law enforcement officials are interested in his or her activities.  Yet, with or without this prior awareness, Defendant surely would have learned of the federal authorities' continued interest in him when Special Agents Balicki and Testani appeared at the door of his Gatlinburg hotel room.  The Court fails to see how the surveillance that preceded this appearance made it more likely that Defendant would accede to the agents' request for an interview, beyond perhaps suggesting the possibility that such a meeting might lead the authorities to discontinue their surveillance.  Whether Defendant harbored such a hope, there is no evidence that the agents made any promise that the surveillance would end if he agreed to be interviewed.  To the contrary, Special Agent Testani testified that he urged Defendant to "forget about" the ongoing

14

surveillance and continue on his family vacation. (6/5/2007 Hearing Tr. at 34-35.)[5]

With regard to Defendant's claim that the agents ignored his request for an attorney, the Court first observes that, by his own admission, Defendant was "not under arrest." ( Defendant's 11/15/2006 Aff. at ¶ 8.) Similarly, Special Agents Balicki and Testani testified that Defendant was not under arrest, that he was free to conclude the interview at any time, and that they advised him of this fact at the outset. Indeed, as discussed earlier, the agents testified that they had no intention of arresting Defendant, but instead sought his cooperation in an investigation into the activities of the Hizballah terrorist organization. It is clear, then, that Defendant had no constitutional right to the representation of counsel during his two meetings with the federal authorities. See Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1883 (1981); see also Burket v. Angelone, 208 F.3d 172, 197 (4th Cir. 2000) (holding that the petitioner in that case "could not invoke the protections provided by *Miranda*," including the right to counsel, "because he was not 'in custody' at the time he stated 'I think I need a lawyer'"); United States v. Wyatt, 179 F.3d 532, 537 (7th Cir. 1999) ("The Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody, even if in anticipation of future custodial interrogation." (citations omitted)); United

---

[5]In finding that the ongoing surveillance of Defendant does not qualify as objectively coercive activity, the Court does not in any way call into question the assertion in Defendant's affidavit that he suffered sleepless nights and feelings of fear and intimidation as a result of this surveillance. Nonetheless, absent coercive police activity, a statement is not rendered "involuntary" even if a defendant is subjectively experiencing fear or intimidation or otherwise is not speaking entirely of his own free will. See Connelly, 479 U.S. at 167, 107 S. Ct. at 522.

States v. Bautista, 145 F.3d 1140, 1147 (10th Cir. 1998) ("[I]n order to implicate the *Miranda-Edwards* right to counsel prophylaxis, both a custodial situation and official interrogation are required."); Alston v. Redman, 34 F.3d 1237, 1244 (3d Cir. 1994) (observing that "*Miranda* is not implicated" absent "*both* a custodial setting and official interrogation"). Rather, such a request for counsel, if made and disregarded, would at most be considered as part of the totality of the circumstances in determining whether Defendant's statements during a non-custodial interview were involuntarily made in response to coercive activity.

In any event, the Court need not decide whether the agents' continued questioning of Defendant despite a request for counsel would have qualified as objectively coercive activity that could render his statements involuntary. Rather, the Court credits the uniform testimony of Special Agents Balicki and Testani alike that they could not recall any such request being made at any point during the July 17 and July 21 meetings. (See 5/14/2007 Hearing Tr. at 73, 85, 87; 6/5/2007 Hearing Tr. at 32, 39.) This testimony was further corroborated by (i) Special Agent Balicki's repeated references to her practice to immediately end an interview if a subject requests an attorney, (see 5/14/2007 Hearing Tr. at 73, 87), and (ii) the evidence that the agents adhered to a similar practice in this case, where Special Agent Balicki recalled Defendant asking at the conclusion of the second meeting whether the agents thought he needed a lawyer, and where a subsequent meeting was cancelled upon Defendant advising Special Agent Balicki that his lawyer had told him not to attend, (see id. at 85-87).

Accordingly, the Court finds that the Government has established by a preponderance of the evidence that its agents did not engage in any objectively coercive activity in connection with the July 17 and July 21, 1998 meetings with Defendant. It follows that there is no basis for suppressing the statements made by Defendant during these interviews.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's November 15, 2006 Second Amended Motion to Suppress Statements is DENIED.

Dated:  September 11, 2007         s/Gerald E. Rosen
                                   Gerald E. Rosen
                                   United States District Judge

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 11, 2007, by electronic and/or ordinary mail.

                                   s/LaShawn R. Saulsberry
                                   Case Manager