THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA
              PLAINTIFF,         CASE NO. 98-80695
V.                               HON. GERALD E. ROSEN
FAWZI ASSI
              DEFENDANT,

FILED
JUL 15 2008
CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

## DEFENDANT ASSI'S SUPPLEMENTAL SENTENCING MEMORANDUM

Now Comes the Defendant, Fawzi Mustapha Assi, appearing pro se, and hereby presents this supplemental sentencing memorandum submitting that the enhancement pursuant to USSG §3A1.4 should not apply and moving this Honorable Court to revisit the Apprendi Claim which was raised in the supplement filed 5/10/2007 as a matter of first impression and to remedy the Defendant's ex-attorney's error by considering the sentencing guidelines mandatory and the enhancement an element of the offense to be proven beyond doubt as was the case at the time of the attorney's error.

## INTRODUCTION

On 29, 2007, the defendant entered a guilty plea to Count One of the Indictment (Material Support to Designated Foreign Terrorist Organization (DFTO), 18 USC § 2339B(a)(1)). The issue in controversy relates to the application of the Terrorism enhancement pursuant to USSG § 3A1.4

USSG. § 3A1.4 states, in pertinent part,
  (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than 32, increase to level 32.
  (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI

The Term, "federal crime of terrorism." is defined at 18 USC § 2332b(g).
  (5) The term "Federal crime of terrorism" means that --
  (A) is calculated to influence or affect the conduct of government by intimidation or coersion, or to retaliate against government conduct; and
  (B) is a violation of --- enumerated offenses including 2339B (relating to providing material support to terrorist organization);

<u>I. The Defendant admits that the material he provided was meant to support the resistance in south Lebanon in their armed conflict with the Israeli Defense Force (IDF) while disagrees with the Government that this support was meant to advance a Federal Crime of Terrorism (FCT).</u>

The Government concluded in its sentencing memorandum filed 6/9/2008 that the material provided was meant to advance the military objective of Hezballah in their armed conflict with the IDF and argued that the issue is not whether the Defendant felt that Hezballah was justified in its conduct as long as the action was calculated to influence or affect the conduct of government by intimidation or coersion. The Defendant disagrees.

Eevery military intervention in the world is meant to influence or affect the conduct of government by intimidation or coersion but not every military intervention is a FCT.

The Government interpretation of the FCT disregards the role of self-defense as it was validated and enacted by the international community through the United Nations Charter Article 51 which reads as follows:

"Nothing in the present Charter shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security. Measures taken by Members in the excercise of this right of self-defense shall be immediatly reported to the Security Council and shall not in any way affect the authority and responsibility of the Security

Council under the present Charter to take at any time such action as it deems necessary in order to maintain or restore international peace and security".
(See Attachment 1.)
This means that the right of self-defence comes to the fore and is legitimate on event of an external aggression.

This Charter was invoked by our Government on numerous occasions

- Our intervention in the Dominican Republic in 1965
- Our participation in the Vietnam war in 1966
- Our attack on Libya on April, 14, 1986 following the death of one of our soldiers in Germany
- Our intervention in Panama, on Dec, 20, 1989 to protect American lives after one US soldier in the US Zone had been shot and killed by Panamanians.
- On August 20, 1998 firing of submarine missles against a military camp in Afghanistan and a Chemical plant in Sudan, in response to the bombing of the US embassies in Kenya and Tanzania
- Last but not least our declaration of war against Afganistan following the infamous 9/11 attack and later our war against Iraq.

All of the above military interventions were aimed at influencing the conduct of governments by intimidation or coersion but cannot in anyway be called Crimes of Terrorism.

Before jumping to the conclusion defined by 18 USC §2332b(g)(5)(A), the Government should prove first whether this resistance was in violation of the U.S. or international laws or whether it was an act of terrorism.

Terrorism is defined by our congress and codified under title 22 of the United States Code section 2656f(d)(2) as a "premeditated, politically motivated violence perpetrated against non combatant targets by substantia groups or clandestine agents".

The international community reached an agreement that was laid down in a resolution passed by consensus by the United Nation General Assembly (UNGA) (resolution 49/60, adopted on Dec. 9, 1994). In the annexed Decleration it contains a provision (para. 3) stating that Terrorism is a:

"Criminal acts intended or calculated to provoke a state of terror in the general public, a group of persons or particular persons for political purposes are in any circumstances unjustifiable, whether the consideration of a political, philosophical, ideological racial, ethnic, religous or any other nature that may be invoked to justify them".

18 USC § 2331 defines Terrorist activities as;
(1) The term "Terrorist activities" means the use of force or violence in violation of the criminal laws of the US or any other state -- that appears to be intended to achieve political or social ends by:
(A) intimidating and coercing a segment of the population
(B) influencing or coercing a government official or officials or
(C) affecting the conduct of government through assasination or kidnapping.

The resistance in South Lebanon against the IDF was excersised in self-defense and did not violate the laws of the U.S. or the international laws and was not aimed at civilian population or non-combatant groups.

The UN Charter Article 51 asserted the people's inherit right for self-defense. The International Criminal Justice (ICJ) held in 1986 in Nicaragua (merits) at § 191 and confirmed in oil platform (merits) at §§ 51, 64 and 72 that "self-defense is a lawfull reaction to an armed attack against the Territorial integrety and political independence of a state that imperils its life and government".

Israel has occupied parts of Lebanon for more than 22 years. In 1978 the United Nation Security Council adopted Resolution 425, which was ratified by 12 votes to 0 (the US was one of the ratifying countries)

See attachment "A". Israel remained in Lebanon until the year 2000.

The U.S. policy consistently called for Israel's immediate withdrawal from all Lebanese territory. At a U.S. Department of State press briefing on March 2, 1998 Department Spokesman James P. Rubin told the press:

"....We have voted for resolution 425 and continue to support it. It has been our position that all foreign troops should withdraw from Lebanon"

(Excerpt from briefing of March 2, 1998. See attachment "B".)

On April 26, 1996 Israel and Hezballah reached an agreement through the diplomatic efforts of the U.S. which reads as follows:

"The United States understands that after discussion with the governments of Israel and Lebanon and in consultation with Syria, Lebanon and Israel will ensure the following:

1. Armed groups in Lebanon will not carry out attacks by Katyusha rockets or by any kind of weapon into Israel.
2. Israel and those cooperating with it will not fire any kind of weapon at civilians or civilian targets in Lebanon.
3. Beyond this, the two parties commit to ensuring that under no circumstances will civilians be the target of attack and that civilian populated areas and industrial and electrical installations will not be used as launching grounds for attacks.

4. Without violating this understanding, nothing herein shall preclude any party from exercising the right of self-defense".

See attachment "C".

The Defendant in this case intended to support a legitimate resistance that was exercising its right for self-defense in accordance and compliance with international laws and agreements. Therefore, reasonableness mandate that the enhancement pursuant to USSG §3A1.4 should not be applied.

## II. Determining the appropriate standard of proof for the enhancement USSG §3A1.4

In United States v. Hughes, 396 F3d 374 (4th Cir, 2005, the Fourth Circuit stated that, as to its review of a sentence for reasonableness, "the determination of reasonableness depends not only on an evaluation of the actual sentence imposed, but also the method employed in determining it Id at 381 n.8.

Although the Supreme Court in Booker determined, by making the Guidelines advisory, that a judge would make factual findings, it did not specifically address the standard of proof by which that judge would make that findings. Given the magnitude of of the increase in the advisory guideline range in this case, this Court should apply the reasonable doubt for (three reasons) Two reasons;

First, the burden of proof is not the defendant's to waive. Apprendi mandates "beyond doubt" to be the standard of proof.

United States V. Huerta-Rodriguez __ F.supp2d __ (D.Neb. Feb, 1. 2005) (relying on Winship 397 US @ 364 and other Supreme Court decisions) Judge Bataillon of the District of Nebraska, has found that while "nothing prevents a defendant from waiving his right to a jury trial and consenting to factfinding by the Court". There is no authority to support the contention that a defendant can consent to a change in the burden of proof for a criminal prosecution because the burden of proof is not the defendant's to waive."

The Defendant brought up the terrorism enhancement issue orally and on 5/10/2007 filed a supplement in support of an oral motion to consider the terrorism enhancement pursuant to USSG §3A1.4, an element of the offense. The Defendant raised in this motion the Apprendi claim which states that "Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the prescribed statutory maximum, must be charged in an indictment submitted to a jury and proven beyond a reasonable doubt." Apprendi V. New Jersey 530 US 466 (2000). It's clear from this reading that the terrorism enhancement pursuant to USSG §3A1.4, which adds 12 additional levels to the offense base level and bumps the case into criminal history category VI, exposing the defendant to a guideline sentencing range of 30 years to life when the prescribed statutory maximum is 10 years. According to the Supreme Court decision on Apprendi, this enhancement must have been considered an element of the offense and must have been charged in the indictment.

This Honorable Court never gave a ruling on this issue. On 3/21/2008, the Defendant filed a motion requesting the Court to rule on the supplement filed 5/10/2007 raising the Apprendi claim. The Court answered the motion but did not address the Apprendi Claim which was an issue of first impression, a pure question of law and where substantial justice was at stake.

The Court, in its opinion issued 4/3/2008 denying the Defendant's motion, stated that "the Court remains free to determine the facts bearing upon the application of § 3A1.4 and any other pertinent guidelines under a preponderence of the evidence, so long as Defendant's sentence does not exceed the ten-year max set forth in the version of § 2339B that applies here."

The Court implied that if the sentence was to exceed the ten-year statutory max, then the burden of proof would've been different which was the case before signing the plea. The Court never addressed this issue and decided to answer the Defendant's motion while avoiding the Apprendi Claim which according to the Court's opinion it should've been granted.

As a matter of first impression, this Honorable Court is kindly asked to revisit the Apprendi Claim raised in the supplement filed 5/10/2007 as it was before signing the plea and consider the enhancement an element of the offense to be proven beyond reasonable doubt.

<u>Second, The Defendant's ex-attorney, Mr. Mullkoff erred and prejudiced the defense</u>

Mr. Mullkoff made it very clear that the terrorism enhancement being a sentencing factor was the major issue in this case. On August 2004, the Government issued the first superceding indictment adding the enhancement as an element of the offense to be proven beyond doubt. This amendment came as a result of the Supreme Court ruling on Blakely v. Washington in June, 2004. This enhancement moves the offense level from 26 catagory I to level 38 catagory VI which carries a sentencing guideline range of 30 years to life.

On September, 2004 Mr. Mullkoff wrote a letter to the Court requesting a decision on the terrorism enhancement and had the Defendant wait on the Court to respond to this letter until early 2005 when the Supreme Court ruled on Booker and FanFan, making the sentencing guideline advisory. As a result, the enhancement in this case became a sentencing factor to be proven by the Government using the preponderance of the evidence as a standard of proof.

Mr. Mullkoff should've known better that the letter to the Court was uncalled for because the enhancement at that time was an element of the offense to be decided by the jury beyond reasonable doubt and it is against the law for the judge to make such a decision or give his opinion before sentencing.

This issue was raised by the Defendant in a suppression hearing which took place tuesday June 5, 2007.

Mr. Mullkoff's performance was unreasonable and his unproffesional error prejudiced the defense meeting the two-part test of ineffective counseling

adopted in Strickland V. Washington 466 US 668 (1984).

Even a single isolated error on the part of counsel can render his assistance ineffective if the error is sufficiently egregious and prejudicial to the defense. See Murray V. Carrier 477 US 478 (1986).

A competent attorney shoul've known that a speedy trial, as requested by the Defendant, or pursuing a reasonable plea at that time would've been the appropriate course of action.

To remedy this error, the Court should consider the sentencing guidelines mandatory and treat the Terrorism enhancement as an element of the offense to be proven beyond reasonable doubt, as this was the case at the time of the counsel's error.

## Conclusion

The Defendant intended to support a resistance exercising its legitimate right for self-defense. This resistance was not targeting civilian populations or non-combatant groups. This resistance was not in violation of the U.S. or international laws. Rather, it was in accordance and compliance with international laws and agreements. This resistance was not an act of terrorism. Therefor, the Terrorism enhancement pursuant to USSG § 3A1.4 should not be applied. In addition, as a matter of first impression, the Court is kindly requested to revisit the Apprendi Claim as it was presented in the supplement filed 5/10/2007

before signing the Plea Agreement, and consider the enhancement an element of the offense to be proven beyond doubt. The Court is kindly requested to remedy the Defendant ex-attorney's error and consider the sentencing guidelines mandatory as was the case at the time of the attorney's error and consider the enhancement an element of the offense to be proven beyond doubt.

Respectfully Submitted,

*[signature]*

6/29/2008

By: Fawzi Mustapha Assi
#25188-039
Milan FDC
Box 1000
Milan, Michigan 48126

cc: Robert Cares
    James Thomas

A

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA
    PLAINTIFF,  CASE NO. 98-80695
V.          HON. GERALD E. ROSEN
FAWZI ASSI
    DEFENDANT,

MOTION INVOKING SIXTH AMENDMENT RIGHT FOR SELF REPRESENTATION AND SUPPLEMENTAL SENTENCING MEMORANDUM.

 Comes Now, Fawzi Mustapha Assi, the defendant in the above proceeding, appearing pro se while he invokes his right to represent himself pursuant to the Sixth Amendment to the U.S. Constitution and all rules of Federal Criminal Procedures.
 The Defendant exercises his right of self-representation at this time for the purpose and issues within the attached "Supplemental Sentencing memorandum" section of this document.

 This Defendant is in sound mind, body and soul. This Court will not be unduly inconvenienced by granting this motion.

The Defendant request that this Honorable Court allow him to represent himself for the purposes and issues of the attached "Supplemental Sentencing memorandum."

Respectfully Submitted,

*Fawzi M. Assi*

6/29/2008

By: Fawzi Mustapha Assi
\# 25188-039
Milan FDC
Box 1000
Milan, Michigan 48160

CC: Robert Cares
James Thomas

## Article 43

All Members of the United Nations, in order to contribute to the maintenance of international peace and security, undertake to make available to the Security Council, on its call and in accordance with a special agreement or agreements, armed forces, assistance, and facilities, including rights of passage, necessary for the purpose of maintaining international peace and security.

Such agreement or agreements shall govern the numbers and types of forces, their degree of readiness and general location, and the nature of the facilities and assistance to be provided.

The agreement or agreements shall be negotiated as soon as possible on the initiative of the Security Council. They shall be concluded between the Security Council and Members or between the Security Council and groups of Members and shall be subject to ratification by the signatory states in accordance with their respective constitutional processes.

## Article 44

When the Security Council has decided to use force it shall, before calling upon a Member not represented on it to provide armed forces in fulfilment of the obligations assumed under Article 43, invite that Member, if the Member so desires, to participate in the decisions of the Security Council concerning the employment of contingents of that Member's armed forces.

## Article 45

In order to enable the United Nations to take urgent military measures, Members shall hold immediately available national air-force contingents for combined international enforcement action. The strength and degree of readiness of these contingents and plans for their combined action shall be determined within the limits laid down in the special agreement or agreements referred to in Article 43, by the Security Council with the assistance of the Military Staff Committee.

## Article 51

"Nothing in the present Charter shall impair the inherent right of individual or collective self-defence if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security. Measures taken by Members in the exercise of this right of self-defence shall be immediately reported to the Security Council and shall not in any way affect the authority and responsibility of the Security Council under the present Charter to take at any time such action as it deems necessary in order to maintain or restore international peace and security."

**UNITED NATIONS**

S



## Security Council

S/RES/425 (1978)
19 March 1978

**Resolution 425 (1978)
of 19 March 1978**

*The Security Council,*

*Taking note* of the letters from the Permanent Representative of Lebanon 1/ and from the Permanent Representative of Israel, 2/

*Having heard* the statement of the Permanent Representatives of Lebanon and Israel, 3/

*Gravely concerned* at the deterioration of the situation in the Middle East and its consequences to the maintenance of international peace,

*Convinced* that the present situation impedes the achievement of a just peace in the Middle East,

1. *Calls for* strict respect for the territorial integrity, sovereignty and political independence of Lebanon within its internationally recognized boundaries;

2. *Calls upon* Israel immediately to cease its military action against Lebanese territorial integrity and withdraw forthwith its forces from all Lebanese territory;

3. *Decides,* in the light of the request of the Government of Lebanon, to establish immediately under its authority a United Nations interim force for Southern Lebanon for the purpose of confirming the withdrawal of Israeli forces, restoring international peace and security and assisting the Government of Lebanon in ensuring the return of its effective authority in the area, the Force to be composed of personnel drawn from Member States;

4. *Requests* the Secretary-General to report to the Council within twenty-four hours on the implementation of the present resolution.

*Adopted at the 2074th meeting by 12 votes to none, with 2 abstentions (Czechoslovakia, Union of Soviet Socialist Republics).4/*

*Notes*

1/ *Ibid.,* documents S/12600 and S/12606.

2/ *Ibid.,* document S/12607.

3/ *Ibid., Thirty-third Year,* 2071st meeting.

4/ One member (China) did not participate in the voting.

*Attachment (C)*

19 of 19

# Israeli-Lebanese Ceasefire Understanding

From Wikipedia, the free encyclopedia

The **Israeli-Lebanese Ceasefire Understanding** (also known as **The Grapes of Wrath Understandings** and the **April Understanding**) was an informal written agreement between Israel and Hezbollah, reached through the diplomatic efforts of the US, which ended the 1996 military conflict between the two sides. The agreement was announced at 18:00 on April 26, 1996.

Under the terms of the agreement, both sides agreed to end cross-border attacks on civilian targets, as well refrain from using civilian villages to launch attacks. The Monitoring Committee for the Implementation of the Grapes of Wrath Understandings was set up, comprised of representatives from the US, France, Syria, Israel and Lebanon. The committee convenes to monitor and discuss infringements of the understandings by the two sides.

## Full Text of the Agreement

The full text of the agreement and adjoining letter from US secretary of state Warren Christopher is as follows:

The United States understands that after discussions with the governments of Israel and Lebanon and in consultation with Syria, Lebanon and Israel will ensure the following:

1. Armed groups in Lebanon will not carry out attacks by Katyusha rockets or by any kind of weapon into Israel.

2. Israel and those cooperating with it will not fire any kind of weapon at civilians or civilian targets in Lebanon.

3. Beyond this, the two parties commit to ensuring that under no circumstances will civilians be the target of attack and that civilian populated areas and industrial and electrical installations will not be used as launching grounds for attacks.

4. Without violating this understanding, nothing herein shall preclude any party from exercising the right of self-defense.

A Monitoring Group is established consisting of the United States, France, Syria, Lebanon and Israel. Its task will be to monitor the application of the understanding stated above. Complaints will be submitted to the Monitoring Group.

In the event of a claimed violation of the understanding, the party submitting the complaint will do so within 24 hours. Procedures for dealing with the complaints will be set by the Monitoring Group. The United States will also organize a Consultative Group, to consist of France, the European Union, Russia and other interested parties, for the purpose of assisting in the reconstruction needs of Lebanon.

It is recognized that the understanding to bring the current crisis between Lebanon and Israel to an end cannot substitute for a permanent solution. The United States understands the importance of achieving a comprehensive peace in the region.

19 of 19

Attachment B

are looking at whether there are other steps we could take to try to revitalize the process that has been so moribund over the last year.

QUESTION: Can you tell us anything about the exchange of correspondence between the Secretary and Palestinian Authority President Arafat last week?

MR. RUBIN: I haven't seen any specific correspondence related to the Middle East peace process. It's possible that in the aftermath or preamble to the possible use force, that messages were transmitted back and forth. But I'm not familiar with any new plans or proposals that we put forward with regard to the Middle East peace process in the last week or so.

QUESTION: And is there any possibility that the Secretary might engage in that process again while she's in Europe next week?

MR. RUBIN: I have not heard this trip - which gets back to your original question, Ralph - I haven't heard any indication that this trip will have a Middle East peace process character to it. And I don't believe Ambassador Ross is manifested.

QUESTION: Jamie, the Israelis are saying today that they've given up pretty much on making peace with Syria and Lebanon, and they simply are interested in a deal to get themselves out of Lebanon. Do you have any reaction to that? Do you concur with that assessment?

MR. RUBIN: Well, I don't concur with the assessment. Certainly, our task continues to try to see if we can find a way to bridge the gap between Israeli views and Syrian views on how to close the circle of peace. That is what the Israeli government has asked us to do, that is what President Clinton wants us to do, and I know Secretary Albright and others have been working on that. It's hard to be optimistic, but "given up" is too strong a word.

With regard to the Lebanon issue, we would welcome any effort by the parties to the Middle East peace process to engage with each other on the issues dividing them. We have voted for Resolution 425 and continue to support it. It has consistently been our position that all foreign troops should withdraw from Lebanon. We hope that Lebanon-Israeli negotiations, if they were to bear fruit, would provide a way for Israel and Lebanon to resolve all the issues that divide them and to enhance Lebanese sovereignty and territorial integrity, as well as the security of both countries.

QUESTION: Should there be negotiations about an Israeli withdrawal or, as the Lebanese and Syrians are claiming, should Israel just get up and leave unilaterally?

MR. RUBIN: We've made clear our view, I think. We have said that all foreign troops should withdraw. I think this has been a topic that has been



Attachment (C)

19 of 19

# Israeli-Lebanese Ceasefire Understanding

From Wikipedia, the free encyclopedia

The **Israeli-Lebanese Ceasefire Understanding** (also known as **The Grapes of Wrath Understandings** and the **April Understanding**) was an informal written agreement between Israel and Hezbollah, reached through the diplomatic efforts of the US, which ended the 1996 military conflict between the two sides. The agreement was announced at 18:00 on April 26, 1996.

Under the terms of the agreement, both sides agreed to end cross-border attacks on civilian targets, as well refrain from using civilian villages to launch attacks. The Monitoring Committee for the Implementation of the Grapes of Wrath Understandings was set up, comprised of representatives from the US, France, Syria, Israel and Lebanon. The committee convenes to monitor and discuss infringements of the understandings by the two sides.

## Full Text of the Agreement

The full text of the agreement and adjoining letter from US secretary of state Warren Christopher is as follows:

The United States understands that after discussions with the governments of Israel and Lebanon and in consultation with Syria, Lebanon and Israel will ensure the following:

1. Armed groups in Lebanon will not carry out attacks by Katyusha rockets or by any kind of weapon into Israel.

2. Israel and those cooperating with it will not fire any kind of weapon at civilians or civilian targets in Lebanon.

3. Beyond this, the two parties commit to ensuring that under no circumstances will civilians be the target of attack and that civilian populated areas and industrial and electrical installations will not be used as launching grounds for attacks.

4. Without violating this understanding, nothing herein shall preclude any party from exercising the right of self-defense.

A Monitoring Group is established consisting of the United States, France, Syria, Lebanon and Israel. Its task will be to monitor the application of the understanding stated above. Complaints will be submitted to the Monitoring Group.

In the event of a claimed violation of the understanding, the party submitting the complaint will do so within 24 hours. Procedures for dealing with the complaints will be set by the Monitoring Group. The United States will also organize a Consultative Group, to consist of France, the European Union, Russia and other interested parties, for the purpose of assisting in the reconstruction needs of Lebanon.

It is recognized that the understanding to bring the current crisis between Lebanon and Israel to an end cannot substitute for a permanent solution. The United States understands the importance of achieving a comprehensive peace in the region.