**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

                                    Case No. 98-80695

v.                                   Hon. Gerald E. Rosen

FAWZI MUSTAPHA ASSI,

        Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING**
**APPLICABILITY OF § 3A1.4 OF THE U.S. SENTENCING GUIDELINES**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on      October 17, 2008     

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I.  INTRODUCTION

On November 29, 2007, Defendant Fawzi Mustapha Assi entered a plea of guilty

to count one of the indictment in this case, in which Defendant is charged with attempting

to provide material support to a foreign terrorist organization in violation of 18 U.S.C. §

2339B(a)(1).  As acknowledged in the Rule 11 plea agreement entered into by the parties,

Defendant's sentencing range under the U.S. Sentencing Guidelines is to be determined in

part by the Court's ruling as to the applicability of § 3A1.4 of the Guidelines, which calls

for a sentencing enhancement if the offense of conviction "is a felony that involved, or

was intended to promote, a federal crime of terrorism."

On June 23, 2008, the Court conducted a hearing on the applicability of § 3A1.4. At this hearing, the Court heard the testimony of three Government witnesses — FBI Special Agent Joseph Testani, Immigration and Customs Enforcement Special Agent Michael Steinbach, and FBI Special Agent Terrence Morisi — and one defense witness, Professor Augustus Richard Norton. In addition, the parties introduced a number of exhibits for the Court's consideration.

Having reviewed and considered the testimony and exhibits offered at the June 23 hearing, as well as the sentencing memoranda filed by the parties before and after this hearing, the applicable case law, and the record as a whole, the Court is now prepared to rule on the applicability of § 3A1.4 to the determination of Defendant's sentencing range under the Guidelines. This opinion and order sets forth the Court's findings of fact and conclusions of law on this sentencing issue. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II.  FINDINGS OF FACT

### A.  Defendant's Detention at the Detroit Metropolitan Airport and Subsequent Meetings with Federal Law Enforcement Officials

On July 13, 1998, Defendant Fawzi Mustapha Assi was preparing to board an international flight departing from the Detroit Metropolitan Airport when he was

approached and detained by federal customs agents.[1]  An ensuing search of Defendant's

luggage revealed two Boeing global positioning satellite modules, night vision goggles,

and a thermal imaging camera.  Under questioning at the airport by ICE Special Agent

Michael Steinbach, Defendant stated that he was planning to travel to Lebanon and

deliver these items to one of two individuals, either Karim Sabra or a man Defendant

identified only as "Hassan."  Special Agent Steinbach testified that, at the time, the night

vision goggles and global positioning systems could be taken out of the United States

only with the appropriate licenses issued by the State Department, but that Defendant

acknowledged during his airport interview that he had not obtained these licenses.

Following this questioning, Defendant was permitted to leave, and he remained in the

United States under FBI surveillance.

In the immediate aftermath of his July 13, 1998 encounter with customs agents at

the Detroit airport, Defendant met with federal law enforcement agents on two separate

occasions.  The first of these interviews occurred on July 17, 1998 in Gatlinburg,

Tennessee, where Defendant met with FBI Special Agents Joseph Testani and Marcia

Balicki.  According to Special Agent Testani, Defendant stated that he had emigrated

from Lebanon to the United States over twenty years earlier, that he held dual Lebanese

and United States citizenship, and that he had made several return visits to Lebanon over

---

[1]In approaching Defendant at the airport, the agents were acting largely on the basis of information derived from the Government's surveillance of Defendant pursuant to a warrant issued under the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801 *et seq.*

3

the years. Defendant further stated that approximately two and a half years earlier, an acquaintance named Sabra had given Defendant's name to an individual in Lebanon that he knew only as "Hassan," and that Hassan had then contacted Defendant by telephone and sought his assistance in procuring various items, including aviation equipment, night vision goggles, technical manuals, and bullet-proof vests.

According to Special Agent Testani, Defendant stated at the July 17 interview that following Hassan's initial contact by phone, he had at least one face-to-face meeting with this individual in Beirut, Lebanon in 1996, and had arranged on more than one occasion for the delivery, through intermediaries, of various items requested by Hassan, including bullet-proof vests, computer software, aviation equipment, and manuals. In addition, Defendant stated that at his meeting with Hassan in Beirut, he was given contact information for two Iranians who also were interested in procuring aviation software and equipment. Defendant initially told Special Agent Testani that Hassan was affiliated either with Hizballah or with the Lebanese police, but he stated later in the interview that Hassan was a member of Hizballah.[2]

In the course of the July 17 interview, Special Agent Testani sought to elicit Defendant's views about Hizballah. According to Special Agent Testani, Defendant stated that he was "sympathetic towards Hizballah and [its] struggle to free the occupied

---

[2]Similarly, at the November 29, 2007 plea hearing, Defendant stated that the items in his possession when he was stopped at the airport on July 13, 1998 were "going to a person in Lebanon who was purchasing those items [for] Hizballah." (11/29/2007 Plea Hearing Tr. at 38.)

territories of [s]outhern Lebanon." (6/23/2008 Hearing Tr. at 31.) These views, in turn, motivated Defendant to assist in Hassan's procurement efforts, with Defendant explaining to Special Agent Testani that he "felt obligated to help Hassan based on the struggle of the Lebanese people and also Hassan's status within Hizballah." (*Id.* at 32.) Defendant further stated that he "wanted the Israelis out" of southern Lebanon, that he "supported Hizballah's fight against the Israelis," and that, by providing the items sought by Hassan, "he thought he was helping Hizballah succeed in that goal." (*Id.* at 38.)

Special Agent Testani also sought Defendant's views about instances in which Hizballah had attacked American interests and civilian targets outside of Lebanon. According to Special Agent Testani, Defendant "disagreed" with these attacks and "thought that it was wrong that Hizballah had done that," but he "thought that [Hizballah] had changed [its] tactics, w[as] getting away from attacking civilian targets." (*Id.* at 33.) Similarly, when Special Agent Testani mentioned the 1983 bombings of the United States embassy and the U.S. Marine Corps barracks in Beirut, Defendant expressed his view that "these were mistakes made by Hizballah early on," but that it had since "become more of a political organization." (*Id.* at 37-38.)

On July 21, 1998, Defendant again met with Special Agents Testani and Balicki, along with a third FBI agent, this time at a hotel in Dearborn, Michigan. At this meeting, Defendant identified Hassan in a photograph, and he acknowledged that he knew this individual's full name — Hussein Hassan — and that he had grown up and gone to

school with Hassan in Lebanon. Defendant also stated that another individual, Issam Zein, was present at his 1996 meeting with Hassan in Beirut, and he identified Zein as a Hizballah leader and as Hassan's superior. Defendant told the agents that it was Zein who had given him the contact information for the Iranians who were interested in procuring aviation software and equipment, and that Zein was "in charge of creating an unmanned aviation vehicle." (*Id.* at 49.) In addition, Defendant stated that Zein was the intended recipient of the global positioning satellite modules found in his luggage at the airport, while Hassan was the intended recipient of the night vision goggles.

When the subject again turned to Hizballah's activities, Defendant expressed his awareness "of Hizballah attacks that [had] occurred outside of Lebanon and the fact that innocent people were injured, killed in those attacks." (*Id.* at 50.) While Defendant expressed his hope and belief that the items he had attempted to provide would be "used to fight the Israelis," he acknowledged that he could not provide any assurances as to the purposes for which this equipment would be used or that they would not be "use[d] against Americans." (*Id.* at 50-51, 75.)

On cross-examination by defense counsel, Special Agent Testani acknowledged that he did not consider himself a specialist in Hizballah's activities, and that when he interviewed Defendant in 1998, he believed, but did not know for a fact, that Hizballah was responsible for the 1983 bombing of the U.S. Marine Corps barracks in Beirut and for certain other terrorist activities that had been attributed to this organization.

Similarly, Special Agent Testani acknowledged that Defendant did not claim during the two interviews to have any personal knowledge about the activities for which Hizballah was responsible, but merely accepted the "conventional wisdom" at the time, as reflected in the agent's questions, that Hizballah had carried out the attacks under discussion. (*Id.* at 73.) In addition, Special Agent Testani agreed that he had no personal knowledge as to any links between Hizballah and the two individuals Defendant met in Beirut in 1996, Hassan and Zein. (*Id.* at 88-89.) Finally, Special Agent Testani confirmed that Defendant did not speak exclusively of Hizballah's efforts to oppose the presence of Israeli troops in southern Lebanon, but sometimes referred more generally to efforts by "the resistance" to fight the Israelis. (*Id.* at 69.)

**B.      The Testimony of Defendant's Expert, Professor Augustus Norton**

At the June 23, 2008 hearing, Defendant offered the testimony of Augustus Norton, Ph.D., a professor of international relations and anthropology at Boston University who has studied and traveled extensively to Lebanon and the Middle East and has written a number of books and articles about the Middle East region and Hizballah. Upon hearing testimony about Professor Norton's background, experience, and publications, the Court determined, under Federal Rule of Evidence 702, that he was qualified as an expert in Hizballah's activities from its founding in the early 1980s until the time period of relevance to this case, the late 1990s. (*See id.* at 138.)

As described by Professor Norton, Hizballah is a Shiite Muslim organization that began to form in 1982, the year that the Israeli Defense Forces ("IDF") invaded southern

Lebanon.  At that time, the Amal militia was the predominant organization pursuing the interests of Shiite Muslims in southern Lebanon, while Hizballah was "inchoate" and a "very immature organization."  (*Id.* at 141.)  Thus, Professor Norton expressed his doubt that Hizballah was responsible for the 1983 bombings of the United States embassy and the Marine Corps barracks in Beirut, although he acknowledged that the organization was "involved in terrorist incidents in the 1980's."  (*Id.* at 142-43.)

As Professor Norton observed, the United Nations Security Council had weighed in on the situation in south Lebanon in 1978, passing Resolution 425 by a 12-0 vote with the United States voting in favor of the resolution.  Professor Norton characterized Resolution 425 as calling for the restoration of peace and security in southern Lebanon, the reinstatement of Lebanese authority over this region, and the withdrawal of Israeli forces from this territory.  Notwithstanding this stated position of the United Nations Security Council and the United States government, the IDF remained in southern Lebanon throughout the period of relevance to this case, and did not withdraw from this region until May of 2000.

During the period from the early 1980s to the late 1990s, Hizballah gained increasing power and stature in the resistance against the Israeli presence in southern Lebanon, and by 1998 the organization "was playing the leading role in the resistance." (*Id.* at 149.)  The goal of this resistance, in Professor Norton's view, was to "get[] [the] Israelis out" of southern Lebanon, and not to "attack[] Israel" across the Lebanese border. (*Id.* at 150-51.)  As he described it, the "Israelis and the resistance, primarily Hizballah,"

had "reached an understanding" by the 1990s as to "what kind[s] of actions were permissible," and had agreed that "Israel would not attack Lebanese civilian settlements" and that "the resistance would not attack Israel." (*Id.* at 153-55.) Professor Norton testified that Hizballah had largely honored this understanding, and he cited instances in which this organization, or the larger Lebanese resistance, had attempted to prevent others from carrying out cross-border attacks. (*Id.* at 152, 155-56.)

In Professor Norton's view, Hizballah had become "the most professional component of the resistance" by 1998, and the organization's military operations "tended to be the best rehearsed [and] the most professional." (*Id.* at 177.) More specifically, Professor Norton estimated that perhaps 60 or 70 percent of the "more effective attacks were being carried out by Hizballah groups" during this period. (*Id.* at 180.) He described a "typical" Hizballah military operation in this time frame as an attack "on Israeli soldiers or [Israel's] militia allies" for the purpose of driving the IDF out of southern Lebanon, and he recalled reading in an Israeli military journal at the time that the Israelis were becoming "very worried" about the rough parity that had been reached in the casualties suffered by resistance and Israeli forces. (*Id.* at 178.)

Beyond this increasing sophistication in its military operations, Hizballah also became more involved in Lebanese politics during the 1990s, winning roughly 10 percent of the seats in the Lebanese parliament in a 1992 election and continuing these political efforts to the present day. (*Id.* at 162-65.) As a result of the organization's success in the political arena and the perception that it was more efficient and less corrupt than other

parties or institutions, Professor Norton testified that many professional and better-educated Shiite Muslims in Lebanon shifted their allegiance from the Amal movement to Hizballah. (*Id.* at 162-63.)

Notwithstanding this evolution, and notwithstanding the IDF's withdrawal from southern Lebanon in 2000, Professor Norton acknowledged on cross-examination that the secretary general of Hizballah, Hassan Nasrallah, has consistently identified the destruction of Israel as one of the organization's principal objectives. (*Id.* at 194-95.) As stated in an article authored by Professor Norton, "one of [Hizballah's] most persistent slogans appearing on poster[s], banners, [and] billboards has been, quote, Death to America and Israel, as frequently reiterated by Secretary General Hassan Nasrallah." (*Id.* at 188.) In addition, Professor Norton agreed that there was a connection in 1998 between Hizballah and Iran, and that Hizballah, especially in its earlier years, would sometimes look to Iranian government officials and religious leaders for instruction and guidance in determining the organization's mission and agenda and in justifying the use of violence against the perceived enemies of Islam, including the West and the United States in particular. (*Id.* at 186-88, 192-93.) Professor Norton further agreed that Hizballah could not be characterized as a governmental entity in Lebanon, and that Nasrallah could not be termed a public official. (*Id.* at 182.)

When asked his opinion of the State Department's decision to designate Hizballah as a terrorist organization, Professor Norton responded that he could "certainly understand why" this decision was made, and he agreed that at least some parts of this

organization had conducted and been involved in terrorist activities.  (*Id.* at 189-90.)  He

noted, however, that the European states generally have adopted "a more nuanced view of

Hizballah," in light of the organization's involvement in political, humanitarian, and

educational activities.  (*Id.* at 190.)  Nonetheless, while Professor Norton described an

ongoing debate within Hizballah in the 1990s and thereafter as to whether to seek only

the withdrawal of Israeli forces from Lebanon or to pursue the more revolutionary goals

and agenda espoused in some of the organization's earlier writings, (*see id.* at 201-02), he

acknowledged that, at a minimum, one of the goals of Hizballah — and of the resistance

as a whole — was to put pressure on and influence the Israeli government to withdraw the

IDF from Lebanon, (*see id.* at 184).

### III.  CONCLUSIONS OF LAW

**A.  The Standards Governing the Court's Decision as to the Applicability of § 3A1.4 of the Sentencing Guidelines**

The issue presently before the Court is whether the enhancement set forth at §

3A1.4 of the U.S. Sentencing Guidelines should be applied in determining Defendant's

sentencing range under the Guidelines.  This provision states:

> **§ 3A1.4.     Terrorism**
>
> (a)  If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.
>
> (b)  In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4.

As explained in the application notes, this Guideline provision adopts the meaning of a "federal crime of terrorism" as set forth at 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1. This statute, in turn, defines a "[f]ederal crime of terrorism" as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and that violates one of several enumerated statutes. 18 U.S.C. § 2332b(g)(5). Among the statutes listed in § 2332b(g)(5)(B) is the one that Defendant is charged with violating in this case, 18 U.S.C. § 2339B.[3] In light of Defendant's plea of guilty to count one of the indictment, in which he is charged with violating § 2339B(a)(1), the application of the § 3A1.4 enhancement here turns upon whether the first prong of the definition of a "federal crime of terrorism" is satisfied — *i.e.,* whether the conduct through which Defendant violated § 2339B was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).[4]

---

[3]Although the list at § 2332b(g)(5)(B) has been updated on multiple occasions since Defendant allegedly engaged in the conduct giving rise to the charges in this case, § 2339B has remained on this list at all times.

[4]As the Court observed in an earlier order in this case, the § 3A1.4 enhancement applies if the offense of conviction "involved" or "was intended to promote" a federal crime of terrorism. U.S.S.G. § 3A1.4(a). In light of this language, the Sixth Circuit has held that a "defendant need not have been convicted of a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)" in order to trigger the § 3A1.4 enhancement, so long as the sentencing court finds "that [the defendant] intended his substantive offense of conviction or his relevant conduct to promote such a terrorism crime." *United States v. Graham,* 275 F.3d 490, 517 (6th Cir. 2001) (footnote omitted). Despite this potentially greater reach of § 3A1.4, the requisite inquiry here is more limited, in light of Defendant's guilty plea to an offense that is expressly listed in § 2332b(g)(5)(B) as eligible for treatment as a "federal crime of terrorism."

As the Government correctly observes in its sentencing memorandum, it bears the burden of showing by a preponderance of the evidence that the elements of the § 3A1.4 enhancement are satisfied here. *See Graham,* 275 F.3d at 517.[5]  In determining whether the Government has met this burden, the Court may consider hearsay and other relevant information without regard to its admissibility under the Federal Rules of Evidence, so long as it "has sufficient indicia of reliability to support its probable accuracy." *United States v. Moncivais,* 492 F.3d 652, 658-59 (6th Cir. 2007) (quoting U.S.S.G. § 6A1.3(a)).

**B.      Defendant's Actions in Attempting to Provide Material Support to Hizballah Were Calculated to Influence or Affect the Conduct of the Israeli Government by Intimidation or Coercion.**

As explained, the applicability of the § 3A1.4 enhancement here turns upon whether Defendant's conduct in attempting to provide material support to Hizballah was "calculated to influence or affect the conduct of government by intimidation or coercion,

---

[5]In a supplemental sentencing memorandum filed shortly after the June 23 hearing, Defendant seeks to once again raise an argument he has advanced at several points in these proceedings — namely, that the applicability of § 3A1.4 should be determined beyond a reasonable doubt, rather than by a preponderance of the evidence.  The Court has repeatedly rejected this contention in this case — most recently, in an April 3, 2008 order, (*see* 4/3/2008 Order at 6-7) — and the Sixth Circuit has expressly held that a district court's § 3A1.4 inquiry is governed by the preponderance of the evidence standard, *see Graham,* 275 F.3d at 517 & n.19.

Under these circumstances, the Court finds no basis for revisiting its resolution of this burden-of-proof issue.  Contrary to Defendant's suggestion in his supplemental memorandum, the determination of the appropriate standard of proof has not been affected in any way by Defendant's decision to plead guilty to count one of the indictment, and he has by no means "waived" any entitlement to a different standard.  Whether Defendant pled guilty to the § 2339B charge or was found guilty by a jury, the standards governing this Court's determination of his Guidelines sentencing range would have been precisely the same — and, in particular, the applicability of § 3A1.4 would have been governed by the very same preponderance standard.

or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). The Court readily concludes that the Government has made this showing by a preponderance of the evidence.

The record before this Court clearly and consistently establishes the objectives that Defendant sought to achieve in his July 13, 1998 attempt to transport global positioning satellite modules, night vision goggles, and a thermal imaging camera to Lebanon. As he stated under questioning by ICE Special Agent Michael Steinbach at the Detroit airport that day, and as he further elaborated in his two subsequent meetings with FBI Special Agent Testani, Defendant planned to deliver these items to two men in Lebanon, Hussein Hassan and Issam Zein, both of whom Defendant believed to be members of Hizballah. Moreover, it is clear from Defendant's statements to Special Agent Testani that Hassan's and Zein's membership in Hizballah was not merely incidental to, but rather was the whole point of, Defendant's willingness to procure equipment on behalf of these individuals. Thus, the evidence plainly establishes Defendant's intent to assist and support Hizballah by delivering the items found in his possession at the airport — and, indeed, this is part of the acknowledged factual basis for Defendant's plea of guilty to count one of the indictment. (*See* 11/29/2007 Plea Hearing Tr. at 38; *see also* Rule 11 Plea Agreement at 2.)

The record also leaves no room for doubt as to the purpose behind Defendant's willingness to provide assistance to Hizballah. In particular, Defendant told Special

Agent Testani, in both of their meetings in July of 1998, that his procurement of equipment on Hizballah's behalf was intended to support this organization's fight against the continued presence of Israeli troops in Lebanon and to assist in its goal of driving the IDF out of that country. The Court credits Special Agent Testani's testimony on this point — and, indeed, there is nothing in the record to contradict it, or that would suggest that Defendant's attempted support of Hizballah was motivated by any other objective. To the contrary, in a memorandum filed on his own behalf shortly after the June 23, 2008 hearing, Defendant expressly "admits that the material he provided was meant to support the resistance in south Lebanon in their armed conflict with the Israeli Defense Force (IDF)." (Defendant's 7/15/2008 Suppl. Sentencing Mem. at 3.)[6]

Under this record, little analysis is required to conclude that Defendant's conduct in the course of his § 2339B offense was "calculated to influence or affect the conduct of government by intimidation or coercion." 18 U.S.C. § 2332b(g)(5)(A). The Government correctly observes — and Defendant does not dispute — that the term "government" as used in § 2332b(g)(5)(A) is not limited to the United States government, but instead plainly encompasses foreign governments as well. *See United States v. DeAmaris,* 406 F. Supp.2d 748, 750-51 (S.D. Tex. 2005); *see also United States v. Puerta,* No. 06-20523,

---

[6]The Court notes that it has repeatedly cautioned Defendant on numerous occasions in this case against filing materials on his own behalf. One reason cited by the Court is that Defendant's submissions could include statements that are not in his best interests or, worse, might tend to undermine or defeat his interests. Defendant's July 15, 2008 supplemental sentencing memorandum is an unfortunate case in point.

249 F. App'x 359, 360 (5th Cir. Oct. 2, 2007); *United States v. Aref,* No. 04-CR-402, 2007 WL 804814, at *2 (N.D.N.Y. Mar. 14, 2007). Moreover, Defendant's expert, Professor Norton, agreed at the June 23 hearing that Hizballah's military operations and attacks in the 1990s were designed and intended, first and foremost, to put pressure on and influence the Israeli government to withdraw the IDF from southern Lebanon. (*See* 6/23/2008 Hearing Tr. at 184.) These operations, then, were clearly "calculated to influence or effect" the Israeli government's decision where and how to deploy Israeli troops.

It is further evident that Hizballah sought to exert this influence by means of "intimidation or coercion." As Defendant has acknowledged in his supplemental sentencing memorandum, the resistance was engaged in an "armed conflict" with the IDF at the time that he sought to provide material support to Hizballah. (Defendant's 7/15/2008 Suppl. Sentencing Mem. at 3.) In addition, Professor Norton testified that Hizballah had assumed "the leading role" in the resistance by 1998, and that a "typical" Hizballah operation in this time frame was an attack on Israeli soldiers or Israel's militia allies for the purpose of driving the IDF out of southern Lebanon. (6/23/2008 Hearing Tr. at 149, 178.) Plainly, such armed military offensives against Israeli troops qualify as "coercion."

Finally, and as observed earlier, Defendant's own statements — initially to Special Agent Testani back in July of 1998, and as recently reiterated in his post-hearing sentencing memorandum — make it clear that his § 2339B offense was meant precisely

16

for the purpose of supporting Hizballah's coercive military efforts to influence the Israeli government. According to Special Agent Testani, Defendant stated at one point that he "wanted the Israelis out" of southern Lebanon, that he "supported Hizballah's fight against the Israelis," and that his attempt to provide material support to Hizballah was intended to "help[] Hizballah succeed in that goal." (6/23/2008 Hearing Tr. at 38.) Similarly, Defendant states in his post-hearing sentencing memorandum that "the material he provided was meant to support the resistance in south Lebanon in their armed conflict with the Israeli Defense Force." (Defendant's 7/15/2008 Suppl. Sentencing Mem. at 3.) And, of course, the items that Defendant attempted to supply to Hizballah — global positioning satellite modules, night vision goggles, and a thermal imaging camera — are wholly consistent with Defendant's stated intent to support operations that were military in nature. Consequently, the Court finds that Defendant's conduct was deliberately calculated to advance Hizballah's effort to influence the Israeli government through coercive military means. It follows that the § 3A1.4 enhancement applies here.

To be sure, there is no evidence that Defendant acted with an intent to support the terrorist attacks against Americans and American interests that have been attributed to Hizballah — most prominently, the 1983 bombings of the United States embassy and the U.S. Marine Corps barracks in Beirut, Lebanon. To the contrary, Special Agent Testani testified that Defendant expressed his disagreement with these attacks, stating that they were wrong and acknowledging that Hizballah had made mistakes in the past. Yet, nothing in § 3A1.4 of the Sentencing Guidelines, nor in its incorporated definition of a

"federal crime of terrorism," *see* 18 U.S.C. § 2332b(g)(5), requires any such showing of

an intent to support or further an organization's terrorist activities.[7]  Thus, while

Defendant sought to raise questions at the June 23 hearing as to whether Hizballah truly

was responsible for some of the terrorist activities attributed to this organization, there is

no need for the Court to address this issue in order to determine the applicability of §

3A1.4 here.[8]  All are agreed that Hizballah *was* involved — and, in fact, played the lead

role — in the armed resistance against the IDF that Defendant sought to support in

committing his § 2339B offense.

Likewise, there is no need for the Court to address Defendant's efforts to confer

legitimacy upon Hizballah's armed opposition to the presence of the IDF in southern

Lebanon.  In his post-hearing sentencing memorandum, for example, Defendant argues

extensively that Hizballah's military operations against Israeli troops in southern

Lebanon were justified under United States and international laws recognizing a right of

---

[7]Similarly, the Court held in an earlier ruling in this case that such an intent need not be proven in order to establish a violation of § 2339B.  *See United States v. Assi,* 414 F. Supp.2d 707, 723-24 (E.D. Mich. 2006).

[8]For what it is worth, in a report accompanying its 1997 designation of Hizballah as a foreign terrorist organization, *see* 62 Fed. Reg. 52650 (Oct. 8, 1997), the U.S. State Department opined that Hizballah was "[k]nown or suspected to have been involved in numerous anti-US terrorist attacks, including the suicide truck bombing[s] of the US Embassy and US Marine barracks in Beirut in October 1983 and the US Embassy Annex in Beirut in September 1984." U.S. State Department, Patterns of Global Terrorism:  1997, App. B, *available at* http://www.state.gov/www/global/terrorism/1997Report/backg.html.  As explained in an earlier decision in this case, Defendant is precluded by statute from challenging the validity of the State Department's designation of Hizballah as a foreign terrorist organization.  *See Assi,* 414 F. Supp.2d at 725 (citing 8 U.S.C. § 1189(a)(8)).

self-defense.  (*See* Defendant's 7/15/2008 Suppl. Sentencing Mem. at 3-8.)  In addition,

Defendant points to the testimony of Professor Norton at the June 23 hearing that the

United States voted in favor of a unanimously-approved 1978 United Nations Security

Council resolution calling for the withdrawal of Israeli troops from southern Lebanon.

Once again, however, nothing in § 2339B, § 3A1.4 of the Sentencing Guidelines, or the

relevant statutory definition of a "federal crime of terrorism" calls upon the Court to

consider whether certain of the activities engaged in by a designated foreign terrorist

organization might be justified under federal or international law, nor whether a

defendant's efforts in support of such an organization were intended to promote such

arguably legitimate activities, as opposed to the activities that led to the organization's

terrorist designation.  Rather, for present purposes, the Court need only determine

whether Defendant's actions in support of Hizballah were "calculated to influence or

affect the conduct of government by intimidation or coercion."  18 U.S.C. §

2332b(g)(5)(A).  As explained, the Court finds that they were.

In the end, Defendant invites the Court to engage in a policy debate about the

wisdom of the § 3A1.4 sentencing enhancement under circumstances such as those

presented here.  He notes, for instance, that the Sentencing Commission need not have

adopted the definition of a "federal crime of terrorism" set forth at 18 U.S.C. §

2332b(g)(5), but instead could have looked to language found elsewhere in the United

States Code — *e.g.,* a statutory provision defining "terrorism" as "premeditated,

politically motivated violence perpetrated against noncombatant targets by subnational

groups or clandestine agents," 22 U.S.C. §2656f(d)(2).  Such policy decisions, however,

are quite properly entrusted to the political branches of our Government — particularly in

this highly sensitive area of international relations — and this Court is not at liberty to

substitute its own views as to the types of conduct that should trigger a "terrorism"

enhancement under the Sentencing Guidelines.

Instead, this Court's present task is limited to applying § 3A1.4 as written.  As

explained, the Court finds by a preponderance of the evidence that this enhancement is

applicable here.[9]  The ramifications of this decision to the determination of Defendant's

---

[9]The Court notes that while Defendant's July 15, 2008 sentencing memorandum is largely directed at the question whether § 3A1.4 is applicable in this case, Defendant also devotes a portion of this submission to challenging the performance of his prior counsel. Similarly, in a motion filed on his own behalf on September 15, 2008, Defendant challenges certain aspects of the performance of his present counsel.  The Court need not decide whether these matters may properly be raised at this juncture, because these challenges are utterly lacking in merit.

First, to the extent that Defendant faults his present counsel for failing to pursue certain challenges based on the rule of lenity and the Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348 (2000), the Court readily concludes that Defendant was not prejudiced by any such purported deficiency in his representation, where the Court addressed his appeal to the rule of lenity in an August 9, 2007 opinion and order, (*see* 8/9/2007 Op. at 6), and where the Court has rejected his *Apprendi* challenge on a number of occasions, including in an April 3, 2008 order and in the present opinion.  Next, to the extent that Defendant complains of his present counsel's failure to advise him about the possibility of a plea of *nolo contendere,* Defendant fails to suggest any basis for believing that the Government would have offered (or the Court would have accepted) such a plea deal here.

Finally, to the extent that Defendant faults his prior counsel for failing to take advantage of a purportedly favorable sentencing environment in the short period between the Supreme Court's decisions in *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531 (2004), and *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005), this argument is defective in at least two respects.  First, it overlooks the Sixth Circuit's intervening *en banc* decision in *United States v.*

ultimate sentence will be addressed at a forthcoming sentencing hearing.[10]

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the sentencing

enhancement set forth at § 3A1.4 of the U.S. Sentencing Guidelines is applicable in

determining Defendant's sentencing range under the Guidelines.  IT IS FURTHER

---

*Koch,* 383 F.3d 436 (6th Cir. 2004), a ruling that was binding upon this Court in the brief interim between *Blakely* and *Booker,* and which adopted a rule that would not have been any more favorable to Defendant than the law that applies post-*Booker.*  Next, Defendant has not cited any authority for the dubious proposition that he is entitled to the most favorable misreading of a Supreme Court decision (*Blakely*) that could have been adopted at any time in this case, despite a subsequent Supreme Court ruling (*Booker*) handed down roughly six months after *Blakely* — and, of course, well before the sentencing phase of this case — that announces the correct reading of *Blakely* and confirms that Defendant's preferred reading is incorrect.

[10]Among Defendant's submissions on his own behalf following the June 23 hearing is a July 23, 2008 motion for a downward departure.  The issues raised in this motion will also be addressed at the forthcoming sentencing hearing.

ORDERED that Defendant's September 15, 2008 motion claiming ineffective assistance

of counsel is DENIED.

s/Gerald E. Rosen
United States District Judge

Dated:  October 17, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record
on October 17, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager